*In re* MARRIAGE OF MARVIN W. HENKE, JR., Petitioner and Counterrespondent-Appellant, and ADELE HENKE, Respondent and Counterpetitioner-Appellee.

Second District No. 2—99—0355

Opinion filed April 26, 2000.—Rehearing denied June 2, 2000.

Randy K. Johnson, of Law Office of Robert A. Chapski, Ltd., of Elgin, for appellant.

Calvin C. Campbell, of De Kalb, for appellee.

JUSTICE THOMAS delivered the opinion of the court:

The petitioner, Marvin W. Henke, Jr. (Marvin Jr.), appeals portions of the trial court's judgment of dissolution of Marvin Jr.'s marriage to respondent, Adele Henke (Adele). Marvin challenges the trial court's classification of certain property as marital property and the trial court's distribution of property. Marvin also appeals the trial court's finding that he dissipated certain marital assets.

The parties presented an extensive amount of testimony and evidence at the trial of the dissolution of marriage. Because the parties are aware of the record in this case, only those facts relevant to the issues on appeal will be discussed. The parties were married on July 24, 1982. The judgment for dissolution of marriage was entered on December 29, 1998. Two children were born during the course of the marriage. Daughter Kristi was born on December 20, 1982, and daughter Haylee was born on January 25, 1986. Prior to the parties' marriage, Adele had worked for Ideal Industries in Sycamore, Illinois. Soon after the marriage, Adele quit her job to become a full-time homemaker. Adele went back to work for Ideal Industries in 1997 when the parties separated. At the time of trial, Adele was earning $320 a week from Ideal Industries and was also earning $334 a month from a part-time job with Salem Lutheran Church. Marvin Jr. is a self-employed farmer.

Following their marriage, Marvin Jr. and Adele lived in a single-family home on 160 acres of Henkeview Farms. Henkeview Farms, which is around 840 acres in total, is owned in trust by Marvin Jr.'s parents, Doris and Marvin Henke, Sr. (Marvin Sr.). The portion of Henkeview Farms where Adele and Marvin Jr. lived was referred to as the Home Farm. Marvin Sr. and Doris lived on a portion of Henkeview Farms known as Dad's Farm. Marvin Jr.'s sister Debbie lived on a section of Henkeview Farms referred to as Debbie's Farm, and his sister Jeannie's portion of the farm was referred to as the Back Farm. Marvin Jr. farmed all of Henkeview Farms and paid cash rent to his parents and siblings for their portions of the property. Following the parties' marriage, Marvin Jr. also bought a 160-acre farm from his neighbor, Kate Clark. This property was referred to as the Clark Farm. Marvin Jr. later sold five acres of the Clark Farm to his father for $50,000.

At the trial of the judgment for dissolution, Marvin Sr. testified

that he gave nearly all his farm equipment to Marvin Jr., some of which Marvin Jr. traded in for newer models. Marvin Sr. said that Henkeview Farms passes to Marvin Jr. when Marvin Sr. passes away. Marvin Sr. used to pay the real estate tax bills for Henkeview Farms, but now the tax bill is split among all of his children. For example, Marvin Jr. pays the taxes for his 160 acres of Henkeview Farms in addition to paying the taxes for the Clark Farm.

Adele testified as an adverse witness during Marvin Jr.'s case in chief that she had been living apart from Marvin Jr. since March 3, 1997. Prior to that time, she had lived with Marvin Jr. in a single-family home on the Home Farm. Adele did not dispute that the parties' home was nonmarital property. Adele said that during the marriage she used money from a checking account at the National Bank and Trust in Sycamore, Illinois (hereinafter the checking account), to pay for groceries and to pay all household and family bills and expenses. The checking account was in the name of Henkeview Farms and Marvin Jr. and had been in existence prior to the time that Adele married Marvin Jr. Adele did not have a signature card to sign checks on the checking account. If she needed money, Marvin Jr. would either sign the checks or he would have Adele sign them for him. From the time of the parties' marriage through the time of their separation, Adele did not have a checking account. The money that went into the checking account was the profit from Marvin Jr.'s farming operations. Although Henkeview Farms was listed on the checking account, Adele testified that Marvin Sr. had nothing to do with the checking account.

Adele testified that the deed to the Clark Farm was in the names of both Marvin Jr. and Adele. Adele said that money from the farming operations was used as a down payment on the Clark Farm and that a loan was taken out on the balance. The loan was for $195,000.

Adele then testified that she had been indicted for forgery with regard to checks from the checking account totaling $6,700. Adele said that she pleaded guilty to misdemeanor theft and was required to pay restitution to Marvin Jr.

Patrick Brennan testified that he is a loan officer and the vice president of National Bank and Trust Company of Sycamore. Brennan said that Marvin Jr. was the only person authorized to sign checks on the checking account. Brennan also said that he had examined the bank records to determine what funds Marvin Jr. had prior to the parties' marriage in 1982. Brennan found a certificate of deposit that had been made out in 1981 in the amount of $94,000. Brennan did not know what happened to the $94,000.

Earl Mecklenburg testified that he is an insurance agent and that Marvin Sr. and Marvin Jr. are his clients. Mecklenburg identified a

farm personal property inventory form dated December 29, 1981, that he had completed. Mecklenburg said that the inventory form listed and valued farm machinery owned by Marvin Sr. and Marvin Jr.

Marvin Jr. then testified that he had been farming with his father since he was 13 or 14 years old. Marvin Jr. said that between 1981 and the time of trial the farm equipment listed in Mecklenburg's 1981 inventory form had been replaced. When Marvin Jr. replaced a piece of equipment, he traded in the old equipment and paid the difference to buy the new equipment. Marvin Jr. paid the cash difference from the checking account. Marvin Jr. could not specifically state when he traded in each piece of equipment listed on the 1981 inventory. Marvin Jr. said he still had some of the equipment listed in the 1981 inventory, including four Parker wagons, a chisel plow, and a tractor.

Marvin Jr. testified that he bought the Clark farm from Kate Clark in 1989 for $320,000 pursuant to an installment contract. Marvin Jr. said that he put down $50,000 to purchase the Clark Farm and that the money came from the $94,000 certificate of deposit that he had prior to his marriage. Marvin Jr. thought he had put another $50,000 down on the Clark Farm after he sold five acres of the Clark Farm to his father. The payments on the Clark Farm came out of the checking account. When there was $195,000 remaining on the installment contract, Marvin Jr. took out a mortgage to pay off the balance. Marvin Jr. said that he took out the mortgage because interest rates had dropped and were lower than the rate that he had been paying to Kate Clark. When Marvin Jr. took out the mortgage, Adele was listed on the note and mortgage and on the deed for the property. Marvin Jr. said that he had not wanted Adele's name on those documents.

With regard to the checking account, Marvin Jr. said that Adele was never supposed to sign checks on the checking account. The checking account has been in existence for 22 to 23 years. Marvin Jr. claimed that the funds in the checking account belonged to his father and himself. Marvin Jr. also said that during the marriage he did not know that Adele had a credit card in her name. Adele had the credit card statements sent to her father's house. When Marvin Jr. filed for dissolution of marriage, he learned that Adele had close to $16,000 in credit card bills. Marvin Jr. said that the checks that were the subject of the forgery charges against Adele had been used to pay Adele's credit card charges. Marvin Jr. testified that Adele had signed his name to those checks.

Marvin Jr. said that he spent a lot of the money that he earned as a farmer and put the remainder of the money into the checking account. The checking account was used to pay family expenses and to pay farm expenses. At the beginning of the parties' marriage, Marvin

Jr. was farming around 680 acres of his father's farm and was farming the Clark Farm. During the course of the parties' marriage, Marvin Jr. paid cash rent to his father on the acreage that belonged to his father.

Marvin Jr. said that during the marriage he built grain bins and a Morton building on the Home Farm. Marvin Jr. and Adele took out a mortgage for the Morton building, and the payments on that mortgage were paid out of the checking account. Marvin Jr. also bought a 1987 Corvette and a 1993 anniversary edition Corvette during his marriage. Marvin Jr. explained that he bought a 1982 Corvette two weeks before he got married. That Corvette was totaled in an accident in the spring of 1983, and Marvin Jr. used the money he received from that accident to purchase a new 1982 collector Corvette. Marvin Jr. sold the 1982 collector Corvette and bought the 1987 Corvette. Marvin Jr.'s name is the only name on the titles to the Corvettes.

Adele then testified in her case in chief that grain bins were put up the Home Farm in 1987 at a cost of around $80,000. The grain bins were paid for with proceeds from the farming operations. Adele said that during her marriage she and Marvin Jr. filed joint income tax returns and paid any taxes owed out of the checking account. Marvin Jr. always paid for seed, fertilizer, and all other expenses related to farming out of the checking account. The parties paid around $100,000 for the Morton building, and a junior mortgage was taken out on the Clark Farm for $60,000 owed on the Morton building. Payments on the junior mortgage were paid out of the checking account. Real estate taxes on the Home Farm and on the Clark Farm also were paid out of the checking account.

Adele said that she had a 1994 Ford conversion van. She and Marvin Jr. also had purchased a 1996 Ford pickup truck during their marriage. Both the van and the pickup truck were purchased with funds from the checking account. Adele further testified that during the marriage Marvin Jr. had a life insurance policy with Country Companies. Policy premiums were paid from the checking account. Marvin Jr. also had a retirement account with the National Bank and Trust of Sycamore. Money was contributed to that account during the marriage from the checking account.

Testifying on behalf of Adele, John Almburg stated that since 1965 he had been a real estate broker and appraiser. Almburg said that the Home Farm consisted of approximately 120 acres. The Home Farm was worth $600,000, or $5,000 per acre. The Clark Farm was worth $3,250 an acre, or $503,750. Almburg testified that the grain bins on the Home Farm increased the value of the property between $25,000 and $50,000, and the Morton building improved the value of the property by $40,000.

At the close of the evidence, the trial court entered its judgment for dissolution of marriage. The trial court held that the farm equipment in Marvin Jr.'s possession that had been owned by him prior to marriage was nonmarital property but that the remaining farm equipment, worth $270,250, was marital property. The trial court found that the Home Farm, which had a value of $600,000, was nonmarital property, but the court ordered reimbursement to the marital estate for the $80,000 of marital funds spent to build the grain bins and for the $40,000 that the Morton building added to the value of the Home Farm. The Clark Farm was held to be marital property and was awarded to Adele. The trial court further held that Marvin Jr.'s life insurance policy and all the vehicles were marital property. In addition, the trial court classified the checking account, which contained $3,886, as marital property.

As noted, Marvin Jr. disputes the trial court's classification of certain property as marital property. First, Marvin Jr. contends that the trial court's finding that the checking account was marital property was against the manifest weight of the evidence. Marvin Jr. notes that Adele had testified that the account existed prior to the time of marriage, that the account was in the name of Marvin Jr. and Henkeview Farms, that Adele was not authorized to sign checks on the account, and that the money that went into the account was from the farming operations of Henkeview Farms, which belonged to Marvin Sr. Marvin Jr. also claims that Adele's guilty plea to the forgery charges constitutes a judicial admission that the checking account was nonmarital property.

Adele concedes that the checking account initially was nonmarital property because it existed prior to the marriage. However, Adele argues that the checking account was transmuted into marital property because income earned during the parties' marriage was deposited into the account and funds from the account were used to pay family expenses throughout the parties' 16-year marriage. Adele also claims that her guilty plea was not a judicial admission because the evidence before the trial court did not include a transcript from the criminal proceedings concerning what Adele had admitted to in the criminal proceedings.

■ In order to distribute property upon the dissolution of marriage, the trial court first must classify the property as either marital or nonmarital property. *In re Marriage of Blunda*, 299 Ill. App. 3d 855, 861 (1998). A trial court's property classification will not be disturbed unless it is contrary to the manifest weight of the evidence. *Blunda*, 299 Ill. App. 3d at 861. The determination of whether property is to be classified as marital or nonmarital is governed by section 503 of the Il-

linois Marriage and Dissolution of Marriage Act (the Act) (750 ILCS 5/503 (West 1998)). Section 503(a)(6) of the Act provides that "nonmarital property" is property acquired by either spouse before the marriage. 750 ILCS 5/503(a)(6) (West 1998). With regard to the commingling of marital and nonmarital property, section 503(c)(1) of the Act provides:

> "(1) When marital and non-marital property are commingled by contributing one estate of property into another resulting in a loss of identity of the contributed property, the classification of the contributed property is transmuted to the estate receiving the contribution ***." 750 ILCS 5/503(c)(1) (West 1998).

Notwithstanding any transmutation, however, section 503(c)(2) of the Act provides that the contributing estate shall be reimbursed from the estate receiving the contribution, unless the contribution cannot be retraced by clear and convincing evidence or was a gift. 750 ILCS 5/503(c)(2) (West 1998).

■ The parties here do not dispute that the checking account at issue was in existence prior to the parties' marriage and thus initially was nonmarital property. The funds deposited into the checking account following the parties' marriage were marital property, as remuneration in whatever form to a spouse during a marriage is considered marital property. *In re Marriage of Phillips*, 229 Ill. App. 3d 809, 818 (1992). Therefore, under a strict application of section 503(c)(1) of the Act, marital funds were contributed to Marvin Jr.'s nonmarital checking account, resulting in a loss of identity of the marital funds so that the classification of the marital funds was transmuted to the nonmarital estate, subject to reimbursement. Because the parties were married for 16 years, however, it likely would be extremely difficult, if not impossible, to retrace the contributions to the checking account for all those years. If Adele could not trace the contributions, all the funds in the checking account for the past 16 years would be considered nonmarital property.

We do not believe that such a strict application of section 503(c)(1) of the Act is proper under these facts. The testimony at trial established that the checking account was used to pay for all household and family expenses, as well as for all farming expenses, during the course of the parties' marriage. The parties never opened a joint checking account, and Adele did not have a checking account of her own prior to the parties' separation. The money that went into the checking account was the profit from Marvin Jr.'s farming operations. Despite Marvin Jr.'s attempt to insinuate that Marvin Sr. had some connection with the checking account, there was no evidence in the record to support such an inference. Aside from any money present in the ac-

count prior to the marriage, then, all the funds that went into the account for the past 16 years have been marital.

We believe that to hold that those funds were transmuted to nonmarital property would contravene the intent behind section 503(c) of the Act (750 ILCS 5/503(c) (West 1998)). Section 503(c) of the Act was amended in 1983 to remedy the result reached by the supreme court in *In re Marriage of Smith*, 86 Ill. 2d 518 (1981), where the court held that a nonmarital apartment building valued at $45,000 had been transmuted into marital property because $3,800 of marital funds had been used to improve the property. See Ill. Ann. Stat., ch. 40, par. 503(c), Supplement to Historical & Practice Notes, at 74 (Smith-Hurd Supp. 1992). At the time that *Smith* was decided, there was a presumption that when marital and nonmarital property were commingled the commingled property became marital property. *Smith*, 86 Ill. 2d at 529. In amending section 503(c) of the Act, the legislature rejected the presumption that commingled property always was transmuted to marital property. *In re Marriage of Harmon*, 133 Ill. App. 3d 673, 675 (1985).

The instant case presents the opposite situation of that sought to be ameliorated by the amendment to section 503(c) of the Act, where a small amount of marital property was contributed to a large amount of nonmarital property. The record does not show the amount of money present in the checking account prior to the marriage. Nonetheless, 16 years of marital funds were contributed to some amount of nonmarital funds. Presumably, the amount of marital funds contributed over 16 years greatly exceeded the amount of nonmarital funds initially present in the account. Under the circumstances, we do not believe that the marital funds put into the checking account were transmuted to nonmarital property. Rather, we hold that, under the unique circumstances of this case, the checking account contained marital funds and therefore was properly characterized as marital property.

In so holding, we find this case distinguishable from our decisions in *In re Marriage of Phillips*, 229 Ill. App. 3d 809 (1992), and *In re Marriage of Perlmutter*, 225 Ill. App. 3d 362 (1992). In those cases, marital funds were contributed to a nonmarital employer savings plan (*Phillips*, 229 Ill. App. 3d at 817) and various nonmarital investment accounts (*Perlmutter*, 225 Ill. App. 3d at 378). This court held that the nonmarital accounts retained their classification as nonmarital property but also held that the marital estate was entitled to reimbursement of its contributions because those contributions were clearly traceable. *Phillips*, 229 Ill. App. 3d at 818; *Perlmutter*, 225 Ill. App. 3d at 379. It does not appear in either case that funds were ever withdrawn from the nonmarital accounts or that funds from the non-

marital accounts were ever used to pay family and household expenses. Here, in contrast, funds were deposited into and withdrawn from the checking account throughout 16 years of marriage and were used to pay all family, household, and farming expenses during that time. Accordingly, the trial court's finding that the checking account was marital property was not against the manifest weight of the evidence.

Marvin Jr. then argues that Adele's guilty plea to four counts of theft with regard to signing Marvin Jr.'s name to checks written on the checking account constitutes a judicial admission that the checking account was nonmarital property belonging to Marvin Jr. We disagree. It does not follow that the funds in that account were nonmarital funds merely because Marvin Jr. was the only signatory to the account. Consequently, Adele's plea of guilty to forging Marvin Jr.'s signature to checks written on the account does not constitute an admission that those funds were not marital funds.

Marvin Jr. next claims that the trial court's ruling concerning the farm equipment was against the manifest weight of the evidence. As noted, with regard to the farm equipment purchased following the parties' marriage, the trial court classified the equipment as marital property with a value of $270,250 and awarded that property to Marvin Jr. Marvin Jr. contends that the trial court's ruling concerning the new farm equipment was against the manifest weight of the evidence because the equipment had been obtained by trading in the farm equipment that he had owned prior to marriage. In addition, Marvin Jr. argues that, because the cost difference between the old and new equipment was paid through the checking account, which he claimed was nonmarital, the farm equipment was nonmarital. We need not address this claim because we have held that the checking account was marital property. Marvin Jr. then argues that, even if the checking account was marital property, the nonmarital estate should have been reimbursed for the trade-in value of the old farm equipment.

■ Section 503(a)(2) of the Act (750 ILCS 5/503(a)(2) (West 1998)) provides that property acquired during marriage in exchange for property acquired before marriage or by gift is nonmarital property. In order to classify such newly acquired property as nonmarital property, a party must prove by clear and convincing evidence that the new property was acquired in exchange for nonmarital property. *In re Marriage of Eddy*, 210 Ill. App. 3d 450, 456 (1991). Any doubts are resolved in favor of finding that the new property is marital. *Eddy*, 210 Ill. App. 3d at 456-57.

■ Upon review, we find that Marvin Jr. did not show by clear and convincing evidence that the new farm equipment was acquired in exchange for the old farm equipment. Although Marvin Jr. testified

that he traded in his old equipment, he did not testify concerning which specific pieces of equipment were traded in, what equipment he purchased in exchange for the old equipment, or what amount he received for trading in his old equipment. The doubts must be resolved in favor of finding that the new equipment was marital property.

In a similar case analyzing the trade-in of farm equipment under section 503(c)(1) of the Act, the reviewing court found that, when nonmarital farm equipment was traded in for new equipment and marital funds were used to pay the difference in value, the marital and nonmarital estates were transmuted into newly acquired marital property. *In re Marriage of Patrick*, 233 Ill. App. 3d 561 (1992). The nonmarital estate was subject to reimbursement if the husband could show by clear and convincing evidence the amount he had received for trading in his old equipment. *Patrick*, 233 Ill. App. 3d at 570. However, because the husband had failed to present any evidence concerning the amount he had received for trade-in, the husband was not able to overcome the presumption of a gift to the marital estate. *Patrick*, 233 Ill. App. 3d at 570.

Relying on his claim that the checking account was nonmarital, Marvin Jr. claims that *Patrick* is distinguishable from the instant case because in *Patrick* marital funds were used to pay the difference between the trade-in value of the old equipment and the cost of the new equipment. Because we have found that the money in the checking account was marital, however, there is no merit to Marvin Jr.'s claim that this case is distinguishable from *Patrick*. In fact here, as in *Patrick*, Marvin Jr. failed to present any evidence concerning the amount of money he had received for the trade-in of his old equipment and, therefore, failed to establish that the nonmarital estate was entitled to reimbursement for that trade-in value. Although Marvin Jr. suggests that this court credit the nonmarital estate with the value of the old farm equipment as set forth in Mecklenburg's 1981 inventory, Marvin Jr. did not present sufficient evidence to show what equipment from the 1981 inventory had been traded in or whether he had received the value shown on the 1981 inventory upon trade-in. Absent clear and convincing evidence concerning the contribution of the nonmarital estate, the nonmarital estate is not entitled to reimbursement.

Finally, Marvin Jr. claims that this case is similar to *In re Marriage of Werries*, 247 Ill. App. 3d 639 (1993). There, the husband had a premarital partnership interest in a farm operation. *Werries*, 247 Ill. App. 3d at 643. The wife claimed that farm equipment and hog confinement buildings acquired by the partnership following the parties' marriage were marital property. *Werries*, 247 Ill. App. 3d at 644. The reviewing court disagreed, noting that the farm equipment was

purchased to keep the nonmarital farm partnership operating, and further noting that a partnership is a separate legal entity for purposes of owning property. *Werries*, 247 Ill. App. 3d at 645. Given the separation of the nonmarital farm partnership from the marital assets, the court in that case held that the farm equipment and hog confinement buildings were nonmarital partnership property. *Werries*, 247 Ill. App. 3d at 646. In so holding, the court distinguished its decision in *Patrick*, which had involved a farm operation run as a sole proprietorship. *Werries*, 247 Ill. App. 3d at 645.

Although Marvin Jr. attempted to establish at trial that he had a partnership with Marvin Sr., the evidence did not support such a finding. Consequently, the instant case is distinguishable from *Werries*. We therefore affirm the trial court's finding that the new farm equipment was marital property.

■ Marvin Jr. next claims that the trial court's classification of all the vehicles as marital property was against the manifest weight of the evidence. Marvin Jr. notes that a 1994 van, a 1993 Corvette, and a 1996 Ford truck all were purchased with funds from the checking account. Because he contends that the checking account is nonmarital, he argues that the vehicles purchased with funds from the checking account also are nonmarital. We have held, however, that the checking account was properly classified as marital property. Accordingly, the three vehicles purchased during the marriage with funds from the checking account also were properly classified as marital property.

Marvin Jr. then argues that the trial court's classification of a 1987 Corvette as marital property was against the manifest weight of the evidence because the 1987 Corvette was purchased with proceeds from a 1982 Corvette that he had purchased prior to the parties' marriage. At trial, Marvin Jr. testified that two weeks prior to his marriage he had purchased the 1982 Corvette. In 1983, the 1982 Corvette was totaled in a car accident. Marvin Jr. then used the insurance proceeds from that accident to purchase a 1982 collector Corvette. Marvin Jr. later sold the 1982 collector Corvette and bought the 1987 Corvette.

As noted, section 503(a)(2) of the Act (750 ILCS 5/503(a)(2) (West 1998)) provides that property acquired during marriage in exchange for property acquired before marriage or by gift is nonmarital property. In order to classify such newly acquired property as nonmarital property, a party must prove by clear and convincing evidence that the new property was acquired in exchange for nonmarital property. *Eddy*, 210 Ill. App. 3d at 456. Any doubts are resolved in favor of finding that the new property is marital. *Eddy*, 210 Ill. App. 3d at 456-57.

As with the farm equipment, Marvin Jr. has failed to prove by

clear and convincing evidence that the 1987 Corvette was acquired in exchange for the original 1982 Corvette. Although Marvin Jr. testified that the original 1982 Corvette was replaced by the collector's edition 1982 Corvette, which then was sold and the proceeds used to purchase the 1987 Corvette, Marvin Jr. failed to provide any documentary evidence in support of this claim. We also note parenthetically that the automobile insurance premiums paid on the original 1982 Corvette, which Marvin Jr. purchased two weeks prior to the parties' marriage, presumably were paid from marital funds, so that the insurance proceeds paid when the Corvette was totaled likewise were marital funds. In any event, any doubts that the trial court may have had concerning Marvin Jr.'s testimony were properly resolved in favor of finding the 1987 Corvette to be marital property.

■ Marvin Jr.'s next claim of error concerns the trial court's classification of his life insurance policy as marital property. Marvin Jr. notes that the policy indicates that it was issued on March 22, 1976, six years before the parties were married. Because the life insurance policy was issued prior to the parties' marriage, Marvin Jr. contends that the trial court's finding that the policy was marital property was against the manifest weight of the evidence.

In response, Adele acknowledges that the life insurance policy was issued prior to the parties' marriage but claims that, because the premiums on the policy were paid for 15 years with funds from the checking account, the life insurance policy was transmuted to marital property.

Upon review, we agree with Marvin Jr. that the trial court erred in classifying the life insurance policy as marital property. The life insurance policy was acquired prior to the marriage and therefore was nonmarital property under section 503(a)(6) of the Act (750 ILCS 5/503(a)(6) (West 1998)). Marital funds were contributed to the nonmarital life insurance policy when used to pay policy premiums. Under section 503(c)(1) of the Act (750 ILCS 5/503(c)(1) (West 1998)), the marital funds were transmuted to nonmarital property, subject to reimbursement to the marital estate. See *In re Marriage of Ryman*, 172 Ill. App. 3d 599 (1988) (reviewing court held that trial court erred in not reimbursing marital estate for its contributions to husband's nonmarital life insurance policies). Consequently, we vacate the trial court's finding that the life insurance policy was marital property and remand this issue to the trial court. On remand, the trial court should include the life insurance policy in Marvin Jr.'s nonmarital estate and should determine the amount of reimbursement, if any, to which the marital estate is entitled.

In holding that the life insurance policy should have been classi-

fied as nonmarital property, we observe that the circumstances surrounding the life insurance policy differ from the circumstances surrounding the checking account. Although marital funds were paid into the life insurance policy, no payments were made from the life insurance policy, nor were proceeds from the life insurance policy used to pay family or household expenses. Consequently, the life insurance policy is similar to the employer savings plan in *In re Marriage of Phillips*, 229 Ill. App. 3d 809 (1992), and the investment accounts in *In re Marriage of Perlmutter*, 225 Ill. App. 3d 362 (1992).

■ Marvin Jr. next argues that the trial court erred in failing to classify the grain bins and Morton building as marital or nonmarital property. Marvin Jr. claims that the trial court further erred in ordering that the marital estate should be reimbursed $120,000 for marital funds expended on the grain bins and Morton building. Marvin Jr. first contends that the grain bins and Morton building were nonmarital because the funds used to pay for the structures came from the checking account. Based upon our finding that the checking account was marital property, there is no merit to this claim. Marvin Jr. then contends that the trial court's award of $120,000 in reimbursement was against the manifest weight of the evidence because Adele's expert had testified that the grain bins enhanced the value of the property between $25,000 and $50,000 and that the Morton building enhanced the value of the property by $40,000, for a total of no more than $90,000 in enhanced value.

At the outset, we find no merit to Marvin Jr.'s claim that the trial court failed to classify the grain bins and the Morton building as either marital or nonmarital property. In ordering reimbursement to the marital estate for funds expended on the grain bins and the Morton building, the trial court necessarily found that those items were nonmarital property. Further, the trial court observed that Marvin Sr. and his wife had assigned a beneficial interest in the Home Farm to Marvin Jr. and held that Marvin Jr.'s interest in the Home Farm was nonmarital property. Consequently, improvements to the Home Farm also would be considered nonmarital property.

We also find no error in the trial court's order reimbursing the marital estate $120,000 for the funds expended on the grain bins and the Morton building. Section 503(c)(2) of the Act (750 ILCS 5/503(c)(2) (West 1998)) provides that, "[w]hen one estate of property makes a contribution to another estate of property, *** the contributing estate shall be reimbursed from the estate receiving the contribution notwithstanding any transmutation; provided, that no such reimbursement shall be made with respect to a contribution which is not retraceable by clear and convincing evidence."

Here, marital funds were contributed to nonmarital property when the grain bins and Morton building were built on the Home Farm, so the marital estate was entitled to reimbursement if the contribution was traceable by clear and convincing evidence. Adele testified that the parties had spent $80,000 to build the grain bins. In addition, Adele testified that the Morton building was built for $100,000 and that the parties still owed $60,000 of that amount in the form of a junior mortgage on the Clark Farm. Adele's testimony was sufficient to trace the contributions of the marital estate to the nonmarital property by clear and convincing evidence. The trial court, therefore, properly determined that the marital estate had contributed $80,000 to the nonmarital grain bins and $40,000 to the nonmarital Morton building, for a total of $120,000. Pursuant to section 503(c)(2) of the Act, the marital estate was entitled to reimbursement in that amount.

■ Marvin Jr.'s last claim of error with regard to the trial court's classification of property concerns the Clark Farm. Marvin Jr. contends that he initially purchased the Clark Farm on his own from Kate Clark for $320,000 pursuant to an installment agreement, paid a $50,000 down payment with funds from a premarital certificate of deposit (CD), and made annual payments from the checking account. Marvin Jr. argues that the $50,000 down payment from his premarital CD rebuts the presumption that the Clark Farm is marital property.

Marvin Jr. argues that this case is similar to *In re Marriage of Hunter*, 223 Ill. App. 3d 947 (1992), where this court held that certain property held in joint tenancy was the wife's nonmarital property. The wife had testified that she alone managed and maintained the property, located tenants for the property, collected and deposited the rent into her personal accounts, and alone or in conjunction with family members made improvements to the property. *Hunter*, 223 Ill. App. 3d at 949. In addition, the evidence at trial established that throughout the parties' marriage they had maintained separate bank accounts and each was responsible for the payment of certain expenses. *Hunter*, 223 Ill. App. 3d at 949. Upon review, this court held that the trial court did not err in finding the property to be the wife's nonmarital property, as there was no evidence of "sharing" between the parties and there was no evidence that the parties each had made contributions to the property. *Hunter*, 223 Ill. App. 3d at 953.

Contrary to Marvin Jr.'s claim, we find this case to be distinguishable from *Hunter*. There is a presumption under the Act that all property acquired during the marriage of the parties is marital property. 750 ILCS 5/503(a) (West 1998). Marvin Jr. does not dispute that the Clark Farm was acquired during the parties' marriage. Therefore, the Clark Farm is presumed to be marital property. Unlike *Hunter*, Mar-

vin Jr. and Adele did not maintain separate bank accounts and did not divide the payment of expenses throughout their marriage. In fact, payments toward the Clark Farm were paid out of the checking account, which we have found to be marital property. Further, although Marvin Jr. claims that he overcame the presumption of marital property because he testified that he used $50,000 from a premarital CD as a down payment on the Clark Farm, we note that the vice president of the National Bank and Trust, Patrick Brennan, testified that he could not verify that the money from Marvin Jr.'s CD was used as a down payment on the Clark Farm. In any event, even if Marvin Jr. had been able to establish that money from his premarital CD was used as a down payment on the Clark Farm, that fact would only establish that Marvin Jr.'s nonmarital estate was entitled to reimbursement of that money and would not establish that the Clark Farm was nonmarital property. Consequently, the trial court's finding that the Clark Farm was marital property was not against the manifest weight of the evidence.

Marvin Jr.'s second issue on appeal is that the trial court abused its discretion in distributing the marital assets and debts between the parties. In its distribution of assets, the trial court awarded Marvin Jr. $691,377 in marital assets and awarded Adele $552,978 in marital assets, including the Clark Farm. The trial court also allocated $436,000 in debt to Marvin Jr. and allocated $30,711 in debt to Adele. The trial court ordered Adele to assume the remainder of the $18,000 mortgage on the Clark Farm, although it ordered Marvin Jr. to pay 10 months of the Clark Farm mortgage and to pay the 1998 real estate taxes. Marvin Jr. claims that paying 10 months of the Clark Farm mortgage and the 1998 real estate taxes increases Adele's net asset allocation by $21,000 and increases his debt allocation by $21,000. Consequently, Marvin Jr. argues that subtracting the division of debt from assets, he was awarded $234,377 in net assets and Adele was awarded $543,267 in net assets.

■ Section 503(d) of the Act provides that the trial court is to divide marital property in just proportions considering 12 relevant factors set forth therein. 750 ILCS 5/503(d) (West 1998). An equal division of marital assets is not required, and one spouse may be awarded a larger share of the assets if the relevant factors warrant such a result. *In re Marriage of Jacks*, 200 Ill. App. 3d 112, 119 (1990). The distribution of marital assets is within the trial court's discretion, and the trial court's distribution will not be disturbed absent an abuse of discretion. *Jacks*, 200 Ill. App. 3d at 119. A trial court abuses its discretion only where no reasonable person would have distributed the property as the trial court. *In re Marriage of Werries*, 247 Ill. App. 3d 639, 649 (1993).

The statutory factors include:

"(1) the contribution of each party to the acquisition, preservation, or increase or decrease in value of the marital or non-marital property, including the contribution of a spouse as a homemaker or to the family unit;

(2) the dissipation by each party of the marital or non-marital property;

(3) the value of the property assigned to each spouse;

(4) the duration of the marriage;

(5) the relevant economic circumstances of each spouse when the division of property is to become effective, including the desirability of awarding the family home, or the right to live therein for reasonable periods, to the spouse having custody of the children;

(6) any obligations and rights arising from a prior marriage of either party;

(7) any antenuptial agreement of the parties;

(8) the age, health, station, occupation, amount and sources of income, vocational skills, employability, estate, liabilities, and needs of each of the parties;

(9) the custodial provisions for any children;

(10) whether the apportionment is in lieu of or in addition to maintenance;

(11) the reasonable opportunity of each spouse for future acquisition of capital assets and income; and

(12) the tax consequences of the property division upon the respective economic circumstances of the parties." 750 ILCS 5/503(d)(1) through (d)(12) (West 1998).

Marvin Jr. claims that the foregoing factors require an equal division of the marital assets and debts. We disagree. Although Adele received more of the net marital assets, Marvin Jr. had significant nonmarital assets, including the Home Farm, which was appraised at $600,000. In addition, the majority of the $436,000 debt assigned to Marvin Jr., aside from $4,409.69 owed on a credit card, consisted of the operating expenses of the Home Farm. Marvin Jr. testified that those expenses are paid when money comes in from the sale of crops. Moreover, Marvin Jr. has a superior earning capacity, has more sources of income, and has a greater opportunity for future acquisition of capital assets and income when compared with Adele. Marvin Jr. farms 840 acres of Henkeview Farms, which passes to Marvin Jr. upon the death of Marvin Sr. In contrast, pursuant to the agreement of the parties, Adele had quit working outside the home when her first child was born in 1982 and did not resume her employment until the parties had separated in 1997. We also note that the trial court awarded Adele sole custody of the children but did not award Adele maintenance.

Under the circumstances and in light of the factors set forth in section 503(d) of the Act, we cannot say that the trial court abused its discretion in distributing the marital assets.

 Marvin Jr.'s final issue on appeal is that the trial court abused its discretion when it found that he had dissipated $33,669.05 in marital assets from an individual retirement account (IRA). Marvin Jr. claims that the trial court *sua sponte* found that he had dissipated marital assets, thereby depriving him of his constitutional right to notice and an opportunity to defend himself.

The testimony concerning the IRA was as follows. On rebuttal, Adele's attorney showed Marvin Jr. a copy of his 1997 income tax return showing a total IRA distribution of $33,669. Adele's attorney then asked Marvin Jr.:

"Q. Okay. Where did this IRA come from that you rolled over?

A. Auh, got me.

Q. Did you previously reveal the existence of that IRA when you answered your interrogatories?

A. I don't remember that I had it.

Q. Do you remember now where it's located?

A. Not right now, no, because I do all my banking at the National Bank.

Q. Do you know what kind of a vehicle the IRA is in?
***
A. It's in an IRA.

Q. But is the IRA in a CD?

A. I don't think so."

Patrick Brennan then testified on behalf of Adele and identified an IRA distribution form showing a distribution to Marvin Jr. on December 30, 1997, in the amount of $33,669.05, with a penalty of $960.50. Brennan had no idea what happened to the funds that had been distributed. Brennan said that on December 31, 1997, there was $10,651.49 remaining in the IRA account. Marvin Jr.'s only testimony in rebuttal concerning that IRA was that he had one IRA remaining containing a little over $10,000. Based upon this evidence, the trial court found that Marvin Jr. had dissipated the $33,669.05 in marital assets.

The dissipation of marital assets occurs when one spouse uses marital property for a purpose that is unrelated to the marriage and is for his or her own benefit at a time when the marriage is undergoing an irreconcilable breakdown. *In re Marriage of Hahin*, 266 Ill. App. 3d 168, 171 (1994). A party charged with dissipating assets must demonstrate through clear and specific evidence how the suspect funds were spent. *Hahin*, 266 Ill. App. 3d at 171. General and vague statements

concerning the funds are not sufficient to defeat a charge of dissipation. *Hahin*, 266 Ill. App. 3d at 171. A trial court's finding of dissipation will not be reversed on appeal absent an abuse of discretion. *Hahin*, 266 Ill. App. 3d at 171. A trial court abuses its discretion only when no reasonable person could adopt the trial court's view. *Hahin*, 266 Ill. App. 3d at 171.

Marvin Jr. claims that the instant case is similar to *Hahin*, where this court held that the trial court had erred in finding, *sua sponte*, that the husband had dissipated assets in maintaining a separate residence. In *Hahin*, we noted that neither party had accused the other of dissipation, the husband had been required to obtain the separate residence when he took a job in Springfield, Illinois, the wife had agreed that she and the children would remain in Glen Ellyn, Illinois, when the husband took the job in Springfield, and there was no clear evidence that the husband had spent more than reasonable sums on his Springfield residence. *Hahin*, 266 Ill. App. 3d at 171. In addition, the record was not clear concerning when the breakdown of the marriage had occurred. *Hahin*, 266 Ill. App. 3d at 171. In reversing, we noted that the husband was never given the opportunity to present "clear and specific" evidence that his expenditures were reasonable. *Hahin*, 266 Ill. App. 3d at 171.

Upon review, we find the facts in this case to be distinguishable from those in *Hahin*. Although Adele did not expressly charge Marvin Jr. with dissipating the money from his IRA, her attorney questioned Marvin Jr. concerning those funds and what he had done with them. Adele also called Patrick Brennan to testify concerning the IRA distribution. Consequently, Marvin Jr. was on notice that the expenditure of the funds was being questioned. Despite the questions raised concerning those funds, Marvin Jr. did not explain what had happened to those funds during questioning from Adele's attorney or when he testified on rebuttal. In addition, the record is clear that the parties separated in March 1997 and that the IRA distribution was taken in December 1997, after the marriage had undergone an irreconcilable breakdown. Under the circumstances, we find that Marvin Jr. had the opportunity to present clear and specific evidence of how the funds were spent but did not do so. Therefore, the trial court did not abuse its discretion in finding that Marvin Jr. had dissipated $33,669.05 in assets.

For all the foregoing reasons, the judgment of the circuit court of

De Kalb County is affirmed in part and vacated in part and the cause is remanded.

Affirmed in part and vacated in part; cause remanded.

McLAREN and RAPP, JJ., concur.