2018 IL App (2d) 170627
No. 2-17-0627
Opinion filed May 31, 2018

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| *In re* MARRIAGE OF PATRICIA A. JAMES, | ) ) ) | Appeal from the Circuit Court of Winnebago County. |
| Petitioner-Appellee, | ) ) | |
| and | ) ) | No. 14-D-86 |
| WILLIAM E. WYNKOOP, | ) ) ) | Honorable Steven L. Nordquist, |
| Respondent-Appellant. | ) | Judge, Presiding. |

JUSTICE SPENCE delivered the judgment of the court, with opinion.
Justices McLaren and Hutchinson concurred in the judgment and opinion.

**OPINION**

¶ 1    Respondent, William E. Wynkoop, appeals from the judgment dissolving his marriage to petitioner, Patricia A. James.  He contends that the trial court erred in classifying as marital property the real estate on which his nonmarital business is located.  Because the trial court's ruling that respondent failed to show that he acquired the property by a method listed in section 503(a) of the Illinois Marriage and Dissolution of Marriage Act (the Act) (750 ILCS 5/503(a) (West 2016)) was not against the manifest weight of the evidence, we affirm.

¶ 2                          I. BACKGROUND

¶ 3     The parties were married in September 1990. Petitioner filed a petition for dissolution of marriage on February 4, 2014, and an amended petition for dissolution on February 14, 2014. A trial was held over the course of two days, on October 17, 2016, and December 5, 2016.

¶ 4     At trial, respondent testified as follows. In March 1984, before his marriage to petitioner, he purchased a fully operating auto body shop located on 35th Street in Rockford (35th Street property) for $205,000. The sale included the land, building, tools, and equipment. He made a down payment of $40,000 and obtained a mortgage in his individual name for the $165,000 balance. He titled the land in his individual name. That same year, he incorporated Auto Rehabilitation Center, Inc. (ARC), and, although the business has since moved to a new location on Colosseum Drive in Rockford (the Colosseum property), he has continued to operate ARC as the sole owner and shareholder.

¶ 5     During their marriage, the parties each received regular paychecks from their jobs, which they deposited into a joint checking account. Respondent maintained separate bank accounts for ARC, including a savings and a checking account. These accounts were always separate from the parties' marital accounts. Petitioner never contributed any money to ARC.

¶ 6     Sometime in 1997 or 1998, respondent decided that he wanted to build from "the ground up" his own body shop that would be tailored to ARC's business. ARC saved "about close to $300,000" in its separate savings account, and respondent purchased the Colosseum property with funds from that account. Respondent testified that he secured a bank loan from Northwest Bank to purchase the Colosseum property and that the loan was in place when the closing took place, on May 27, 1999. He titled it in his individual name, rather than in the name of his business, for tax purposes. The Colosseum property was never sold, conveyed, or transferred to

any other person or entity. At the time of the trial, the Colosseum property remained titled in respondent's name.

¶ 7    Sometime in late 1999, respondent created a business proposal to develop the Colosseum property, and he presented it to Bill Redig, who was then a commercial loan officer at Northwest Bank. The bank issued two loan-commitment letters on November 4, 1999, both of which were admitted into evidence. The first loan-commitment letter was for $1.6 million to finance the construction of a new auto body shop on the Colosseum property. It identified respondent individually as the borrower and listed as collateral the first mortgage on the Colosseum property and the assignment of an insurance policy on respondent's life. The second loan-commitment letter was for $500,000 to finance equipment and furnishings for the new body shop. It listed ARC as the borrower and required as collateral a blanket security agreement on ARC's assets and respondent's unlimited personal guaranty. Respondent described these Northwest Bank loans as covering "the purchase of the building, the property building, and the tool and equipment loan." Petitioner did not participate in negotiating either loan, nor did the bank ask her to provide collateral or her signature.

¶ 8    Respondent sold the 35th Street property for $325,000 in June 2000, when construction of the new body shop at the Colosseum property "was about half way finished." At the time of the sale, the 35th Street property was still encumbered by a mortgage, and respondent received only a negligible amount from the sale.

¶ 9    After the new body shop at the Colosseum property was completed, the construction loan that had encumbered it became a mortgage, which also was in respondent's individual name. Based on advice he received from Alfred Johnson, his "on and off" financial advisor, respondent decided to charge ARC rent in the amount of $25,000 per month. Petitioner was involved in

these transactions, in that she typically deposited the rent checks into the parties' joint account and then paid the mortgage on the Colosseum property from that account. This arrangement began in 2000 and continued until the parties separated, after which ARC began paying rent directly to respondent. At the time of trial, just under $500,000 remained due on the mortgage, and ARC had paid off the $500,000 equipment loan.

¶ 10    On cross-examination, respondent testified that he purchased the Colosseum property in cash for $270,000, using funds in ARC's savings account, and that approximately $30,000 remained in the account. Respondent agreed that during the course of the dissolution proceedings he did not disclose any documentation related to the source of the cash that he used to purchase the Colosseum property. He stated that he did not have any such documentation, nor did he have copies of his 1998 or 1999 personal or corporate income-tax returns.

¶ 11    Johnson testified as follows. He had been respondent's and ARC's "on and off" accountant and tax advisor since 1985. When respondent was considering purchasing the 35th Street property, Johnson advised him that "it would be preferential to own the real estate individually and own the business as a corporation." He also gave respondent this advice when respondent contacted him regarding the Colosseum property, although Johnson was not "doing the books" for ARC at that time. Beyond advising respondent how to title the Colosseum property, Johnson was not involved in the transaction to purchase it.

¶ 12    Johnson testified that, prior to January 1, 2000, if an individual were to take $270,000 out of a corporation and use it to purchase real property, it would have been in the form of a dividend. Johnson was not aware of any $270,000 dividend paid to respondent. After January 1, 2000, if an individual took $270,000 out of a corporation, it would be characterized as either

income, a onetime distribution, or a dividend, depending on whether the corporation was a subchapter S corporation or a subchapter C corporation.

¶ 13 Redig testified as follows. He was assistant vice president at Northwest Bank. He identified as exhibits two loan-commitment letters dated November 4, 1999. One letter was issued to respondent as the borrower of $1.6 million for the construction of a commercial building on the Colosseum property. The other letter was issued to ARC as the borrower of $500,000 for equipment and furnishings, and it included a $100,000 revolving line of credit. The collateral for the construction loan was the first mortgage on the Colosseum property, the assignment of an insurance policy on respondent's life, and his personal guaranty. Both of these transactions were carried out, and Redig specifically remembered them because respondent was one of his first major customers after he started working at the bank. Petitioner was not involved with either transaction, and she did not provide any collateral for the loans.

¶ 14 Northwest Bank would have required a minimum of 20% down on the total cost of the construction project. The 35th Street property was sold in 2000, and all of the sale proceeds were rolled into the construction project—they were not used to purchase the Colosseum property itself. Typically, sale proceeds must be spent on a project's construction expenses before the bank will advance any funds on a construction loan, and that is what he expected respondent to do with the proceeds from the sale of the 35th Street property. He could not recall specifically when they closed on respondent's construction loan.

¶ 15 Redig testified that he was not involved in the transaction in which respondent paid cash for the Colosseum property. When respondent came to him, respondent already owned the land and was looking for a construction loan to build "the building itself."

¶ 16     Petitioner testified as follows. She was a full-time registered nurse when she married respondent. She retired from nursing in 1999 and began working full-time for ARC until the parties separated. She was not paid for her work at ARC. She and respondent combined their finances in joint savings and checking accounts. After the new body shop opened on the Colosseum property, each month respondent would bring home two salary checks totaling $5000 and a rent check for $20,000. Petitioner would deposit the rent check into the parties' joint checking account and then write a check to Northwest Bank for the mortgage payment on the Colosseum property. The mortgage was about $9000 or $10,000 per month, and the remainder of the rent proceeds was used to cover the parties' monthly living expenses. Respondent eventually ceased bringing home the two monthly salary checks and instead brought home a rent check for $25,000. This arrangement continued until she filed for divorce, and she presumed that respondent then began to make the mortgage payment on the Colosseum property himself. The parties stipulated that, if recalled, petitioner would testify that Johnson and respondent were longtime personal friends, that they had been roommates, and that their friendship predated the parties' marriage. The parties also stipulated that petitioner's work for ARC did not constitute a substantial contribution to the appreciation of ARC's value.

¶ 17     The trial court issued a memorandum of decision on January 27, 2017. It classified ARC as respondent's nonmarital property, noting that he incorporated it prior to his marriage to petitioner and had operated it out of the 35th Street location. The trial court also found that, sometime in 1999 or 2000, ARC moved to the Colosseum property and that respondent purchased the real estate in his individual name and never transferred title to the business. The trial court therefore classified it as marital property, "because it was acquired after the date of the marriage and the [respondent] *** did not satisfy his burden of proof by clear and convincing

evidence that the property was acquired by a method listed in subsection (a) of [section 503] for his request that it is non-marital property."

¶ 18    On March 7, 2017, the trial court entered a judgment for dissolution of marriage fully incorporating its memorandum of decision. Respondent sought reconsideration thereof, and the trial court denied it after a hearing on July 20, 2017. Respondent timely appealed.

¶ 19                                II. ANALYSIS

¶ 20    The disposition of property in a dissolution-of-marriage proceeding is governed by section 503 of the Act (750 ILCS 5/503 (West 2016)). All property owned by the parties in a dissolution proceeding belongs to one of three estates—the husband's estate, the wife's estate, or the marital estate. *In re Marriage of Werries*, 247 Ill. App. 3d 639, 641-42 (1993). Before a court may dispose of property upon the dissolution of a marriage, it must determine whether the property is marital or nonmarital. *In re Marriage of Henke*, 313 Ill. App. 3d 159, 166 (2000). After the trial court classifies the property, it awards each spouse his or her nonmarital property and divides the marital property into just proportions. 750 ILCS 5/503(d) (West 2016). A trial court's classification of property as marital or nonmarital will not be disturbed on appeal unless it is against the manifest weight of the evidence. *In re Marriage of Romano*, 2012 IL App (2d) 091339, ¶ 44. A decision is against the manifest weight of the evidence only when the opposite conclusion is clearly apparent or when the court's findings appear to be unreasonable, arbitrary, or not based on the evidence. *Id.*

¶ 21    The sole issue raised in this appeal is whether the trial court's classification of the Colosseum property as marital property was against the manifest weight of the evidence. Respondent argues that this finding was error, contending that the trial court classified ARC as his nonmarital property yet classified the real estate upon which it is situated as marital property

"simply because it was purchased after the marriage and titled in respondent's name individually even though it was done for tax planning purposes." Respondent argues that, although the trial court found that he failed to demonstrate that he acquired the property by a method listed in section 503(a), its analysis improperly "stopped there" without considering the 2016 amendment to section 503(b)(1) (750 ILCS 5/503(b)(1) (West 2016)) or the addition of section 503(a)(6.5) (*id.* § 503(a)(6.5)).

¶ 22    We first address respondent's argument regarding the amendment to section 503(b)(1) of the Act.  Prior to the amendment, section 503(b)(1) provided that "[t]he presumption of marital property is overcome by a showing that the property was acquired by a method listed in subsection (a) of this Section."  750 ILCS 5/503(b)(1) (West 2014).  Respondent stresses that this provision was amended effective January 1, 2016, to provide: "The presumption of marital property is overcome by showing through clear and convincing evidence that the property was acquired by a method listed in subsection (a) of this Section *or was done for estate or tax planning purposes or for other reasons that establish that a transfer between spouses was not intended to be a gift*."  (Emphasis added.)  750 ILCS 5/503(b)(1) (West 2016).  Respondent seizes on the added language pertaining to "tax planning purposes" and argues that the trial court failed to apply the language to certain "undisputed and uncontroverted" evidence—namely that (1) Johnson advised him to purchase the Colosseum property in his individual name for tax purposes—just as he had recommended when respondent purchased the 35th Street property, (2) the funds used to purchase the Colosseum property came entirely from ARC, (3) petitioner had no involvement with the acquisition or financing of the Colosseum property, and (4) the Colosseum property was not intended to be a gift to the marital estate.

¶ 23    Petitioner counters that the "estate or tax planning purposes" language of section 503(b)(1) does not apply to this case, because (1) the Colosseum property was presumptively marital property, (2) respondent failed to show through clear and convincing evidence that the funds used to purchase the Colosseum property came from a nonmarital source under section 503(a), and (3) there was no transfer of nonmarital property into a form of co-ownership with petitioner, as contemplated in section 503(b)(1), as amended.

¶ 24    We agree with petitioner that the "estate or tax planning purposes" language of section 503(b)(1) is inapplicable to this case and that, therefore, the trial court committed no error in not applying it.  In construing a statute, our primary objective is to ascertain and give effect to the legislature's intent.  *MidAmerica Bank, FSB v. Charter One Bank, FSB*, 232 Ill. 2d 560, 565 (2009).  "The best evidence of legislative intent is the language used in the statute itself, which must be given its plain and ordinary meaning."  *Paris v. Feder*, 179 Ill. 2d 173, 177 (1997).  A statute must be read as a whole and not as isolated provisions.  *In re Shelby R.*, 2013 IL 114994, ¶ 32.

¶ 25    Here, a complete recitation of section 503(b)(1) of the Act is necessary.  It provides:

>   "For purposes of distribution of property, all property acquired by either spouse after the marriage and before a judgment of dissolution of marriage or declaration of invalidity of marriage is presumed marital property.  This presumption includes non-marital property transferred into some form of co-ownership between the spouses, regardless of whether title is held individually or by the spouses in some form of co-ownership such as joint tenancy, tenancy in common, tenancy by the entirety, or community property.  The presumption of marital property is overcome by showing through clear and convincing evidence that the property was acquired by a method listed

in subsection (a) of this Section or was done for estate or tax planning purposes or for other reasons that establish that a transfer between spouses was not intended to be a gift." 750 ILCS 5/503(b)(1) (West 2016).

¶ 26    Under a plain reading of section 503(b)(1), the marital-property presumption applies to (1) all property acquired by either spouse during the marriage, and (2) all nonmarital property that is transferred into some form of co-ownership between the spouses.  The last sentence of section 503(b)(1) establishes the means by which the presumption of marital property may be overcome—depending on how the presumption arose.  When section 503(b)(1) is read as a whole, it becomes clear that the phrase "estate or tax planning purposes" modifies the previous sentence regarding the transfer of nonmarital property into some form of co-ownership between the spouses.[1]   Thus, in order to trigger the "estate or tax planning" language under section 503(b)(1), one must first show through clear and convincing evidence that the property at issue was originally nonmarital under section 503(a).  See *id.*

¶ 27    Respondent's argument that the Colosseum property is his nonmarital property under section 503(b)(1), because he titled it in his individual name "for tax purposes," relies on a flawed reading of an isolated portion of the statute and puts the proverbial cart before the horse. Simply put, his argument presupposes that the Colosseum property was his nonmarital property in the first instance—without a showing though clear and convincing evidence that it was acquired by a method listed in section 503(a).

¶ 28    It is undisputed that respondent acquired the Colosseum property in his individual name nearly 10 years into the marriage.  It is therefore presumed to be marital property.  See *id.*;

_____

[1] We observe that, tellingly, respondent omitted this sentence when quoting section 503(b)(1) in his briefs.

*Romano*, 2012 IL App (2d) 091339, ¶ 45. The presumption is overcome by a showing through clear and convincing evidence that the property was acquired by a method listed in section 503(a). *In re Marriage of Brill*, 2017 IL App (2d) 160604, ¶ 52; *In re Marriage of Asta*, 2016 IL App (2d) 150160, ¶ 16. Section 503(a) contains an exclusive and specific list of nonmarital property. *In re Marriage of DeRossett*, 173 Ill. 2d 416, 420 (1996). The burden of proof is on the party claiming that the property is nonmarital. *In re Marriage of Schmitt*, 391 Ill. App. 3d 1010, 1017 (2009).

¶ 29 The question therefore is whether respondent, as the party with the burden of proof, overcame the marital-property presumption by showing though clear and convincing evidence that the Colosseum property was acquired by a method listed in section 503(a). The trial court found that he did not, and, after reviewing all of the evidence adduced at trial, we cannot say that this finding was against the manifest weight of the evidence.

¶ 30 The only evidence respondent presented at trial to support his claim that only nonmarital funds were used to purchase the Colosseum property was his own testimony, which was muddled and inconsistent at best. Respondent testified that he purchased the property for $270,000 "in cash" using funds from the "close to $300,000" that ARC had in its savings account. However, he also testified that he "secured a loan to purchase Colosseum Drive," which was in place at the time of the closing. Similar contradictions appear throughout his briefs. For example, he states that he "unequivocally testified that he purchased the Colosseum Property with cash he withdrew from a bank account of ARC" and that he "purchased the Colosseum Property for $270,000 with the funds in the ARC account," but he also says that he "testified that he purchased the Colosseum Property *** with the funds in the ARC account along with a loan from Northwest Bank."

¶ 31    Respondent maintains that his testimony as to the nonmarital source of the funds used to purchase the Colosseum property is supported by "the undisputed corroborating documentary evidence and testimony [of] Alfred Johnson and Bill Redig." However, he neglects to identify which documents he claims are "corroborating." Additionally, none of the testimony provided by either Johnson or Redig concerns the source of the funds. Johnson testified that he was not "doing the books" for ARC when respondent acquired the Colosseum property, and that he was not involved in the transaction other than advising respondent to own it in his individual capacity. Johnson also testified that he was unaware of any dividend from ARC to respondent. Similarly, Redig testified that he was not involved in the transaction in which respondent purchased the Colosseum property and that respondent already owned it when he approached him for the construction loan.

¶ 32    As petitioner notes, respondent presented no documentary evidence, such as bank records, account slips, cancelled checks, or income-tax returns, to show the source of the funds he used to purchase the Colosseum property—let alone any to demonstrate that the funds came from his nonmarital business. Indeed, petitioner produced the only documentary evidence that relates in any way to the land acquisition: the warranty deed and the settlement statement. The settlement statement indicates that respondent borrowed $200,000 from Northwest Bank in his individual name and paid cash of approximately $70,000. Regardless of whether respondent brought $70,000 or $270,000 to the closing, the fact remains that no document in the record establishes the source of those funds. " 'Tracing of funds is a procedure which allows the court to find that property which would otherwise fall within the definition of marital property is actually nonmarital property under one of the statutory exceptions.' " *In re Marriage of Stuhr*, 2016 IL App (1st) 152370, ¶ 52 (quoting *In re Marriage of Jelinek*, 244 Ill. App. 3d 496, 504

(1993)). "Tracing requires that the source of the funds be identified." *In re Marriage of Davis*, 215 Ill. App. 3d 763, 770 (1991). Though the absence of documentary evidence tracing funds to a nonmarital source does not *necessarily* preclude a party from rebutting the marital-property presumption (see *Henke*, 313 Ill. App. 3d at 174 (finding wife's testimony sufficient to trace marital-estate contributions to husband's nonmarital property)), we can see no reason why the trial court here should have deemed respondent's testimony alone to be clear and convincing, in light of its various shortcomings. As noted above, we view respondent's testimony concerning the source of the funds used to purchase the Colosseum property, as well as the exact dollar amount, to be vague and inconsistent. These shortcomings were repeated, rather than clarified, in respondent's briefs.

¶ 33    It is also of no import that petitioner offered no evidence that marital property was used to purchase the Colosseum property. As noted, respondent bore the burden to rebut the marital-property presumption with clear and convincing evidence that the property was acquired by a method listed in section 503(a) of the Act. 750 ILCS 5/503(b)(1) (West 2016). In drafting the Act, "the legislature strongly favored the presumption of marital property, setting a high evidentiary hurdle for litigants attempting to overcome the presumption." *In re Marriage of Didier*, 318 Ill. App. 3d 253, 262 (2000). Simply put, petitioner had no obligation to contradict respondent's evidence or present her own evidence that the property was marital. See *Stuhr*, 2016 IL App (1st) 152370, ¶ 57.

¶ 34    As respondent failed to establish, as a threshold issue, that the Colosseum property was acquired by a method listed in section 503(a) of the Act, the trial court could "stop there" without considering evidence of "estate or tax planning" under section 503(b)(1).

¶ 35    In light of all of the above, we cannot say that the trial court's finding that the Colosseum property was marital property was against the manifest weight of the evidence.

¶ 36    Respondent next contends that the trial court's ruling was error because it failed to consider the 2016 addition of section 503(a)(6.5) to the Act, which created a new category of nonmarital property: "[a]ll property acquired by a spouse by the sole use of non-marital property as collateral for a loan that then is used to acquire property during the marriage; to the extent that the marital estate repays any portion of the loan, it shall be considered a contribution from the marital estate to the non-marital estate subject to reimbursement." 750 ILCS 5/503(a)(6.5) (West 2016).

¶ 37    We find that respondent has forfeited this issue on appeal. Respondent's "argument" on this point in his opening brief consists nearly entirely of a copy-and-paste version of his "tax planning" argument, save for the statutory language and citation. Illinois Supreme Court Rule 341(h)(7) (eff. Nov. 1, 2017) requires that an appellant's brief contain "[a]rgument, which shall contain the contentions of the appellant and the reasons therefor, with citation of the authorities and the pages of the record relied on. *** Points not argued are waived and shall not be raised in the reply brief, in oral argument, or on petition for rehearing." Respondent's argument falls woefully short of what is required under this rule, which our supreme court has stated is not a mere suggestion, but has the force of law. *Rodriguez v. Sheriff's Merit Comm'n*, 218 Ill. 2d 342, 353 (2006). "A reviewing court is entitled to have the issues on appeal clearly defined with pertinent authority cited and a cohesive legal argument presented." *Thrall Car Manufacturing Co. v. Lindquist*, 145 Ill. App. 3d 712, 719 (1986). The appellate court is not a depository into which the appellant may dump the burden of argument and research. *In re Marriage of Petrik*,

2012 IL App (2d) 110495, ¶ 38. Failure to follow Rule 341 may result in forfeiture of an issue on appeal. *Kic v. Bianucci*, 2011 IL App (1st) 100622, ¶ 23. Such is the case here.

¶ 38                                III. CONCLUSION

¶ 39    For the reasons stated, we affirm the judgment of the circuit court of Winnebago County.

¶ 40    Affirmed.