2019 IL App (2d) 190119-U
No. 2-19-0119
Order filed October 22, 2019

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| *In re* MARRIAGE OF | ) | Appeal from the Circuit Court |
| CARLOS BENGOA, | ) | of Winnebago County. |
| | ) | |
| Petitioner-Appellant and, | ) | |
| Cross-Appellee, | ) | |
| and | ) | No. 06-D-1351 |
| VICKIE KUHL, | ) | |
| | ) | Honorable |
| Respondent-Appellee and | ) | Ronald A. Barch, |
| Cross-Appellant. | ) | Judge, Presiding. |

JUSTICE ZENOFF delivered the judgment of the court.
Presiding Justice Birkett and Justice Hudson concurred in the judgment.

**ORDER**

¶ 1    *Held*:   The appellate court affirmed the trial court's order granting the wife $720,000 in maintenance in gross where the court appropriately considered the required statutory factors; the appellate court affirmed the trial court's order apportioning the marital estate with 60% to the husband and 40% to the wife where the court's factual findings were not against the manifest weight of the evidence and its ultimate decision regarding the distribution of assets was not an abuse of discretion.

¶ 2    Petitioner, Carlos Bengoa, appeals the judgment of the circuit court of Winnebago

County awarding respondent, Vickie Kuhl, maintenance in gross in the amount of $720,000;

Vickie cross-appeals, challenging the court's order that granted Carlos 60% and her 40% of the marital estate. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4     Carlos Bengoa and Vickie Kuhl were married on March 5, 1994. They settled in a home in Roscoe, Illinois, that they shared before the marriage. Carlos was 44 years old, and Vickie was 36 years old at the time of the marriage. Vickie had one minor child from a previous marriage. Carlos and Vickie had no children together during the marriage.

¶ 5     As of 1994, Vickie worked as a letter carrier at the United States Postal Service and Carlos was unemployed. Carlos testified at the hearing on financial matters that he began looking into starting his own business. Vickie testified that she found an advertisement in a local newspaper for Mr. Checkout, a business opportunity that granted the purchaser the right to sell and supply goods to convenience stores and gas stations in the Aurora, Illinois, area. The couple purchased the business by taking out a $15,000 mortgage against their home. The business eventually became known as CB Distributors, Inc. (CB Distributors). CB Distributors grew to be the primary source of income that led to the accumulated wealth in the marital estate, which Carlos and Vickie ultimately stipulated to be valued at $10.48 million.

¶ 6     Carlos initially based the business out of the couple's living room, and then their garage. Carlos would load a van with goods each evening and then personally deliver the product to customers the next day while also canvassing for new customers. Vickie continued to work at the postal service until 1997. She testified at the hearing that she periodically assisted Carlos on nights and weekends.

¶ 7     Carlos testified that he incorporated the business "a couple of years" after he began operations, and that he and Vickie each held 50 percent of the shares of the business. On cross-

examination, Vickie conceded that it was fair to say that Carlos was mostly responsible for the financial success and growth of CB Distributors. Carlos testified that he made all of the significant business decisions, including marketing strategies, product lines, operations, and financing. Vickie described her role as that of a "Girl Friday." She said that she did whatever Carlos needed of her for the business. She answered phones, prepped orders, tallied receipts, oversaw insurance matters, obtained a hazardous materials certificate, and tended to warehouse landscaping. As CB Distributors grew, its base of operations went from the couple's garage to a series of small warehouse facilities in and around Roscoe. Carlos testified that in 2004 he negotiated with the City of Beloit, Wisconsin, to purchase an eight-acre tract of land where he built a 56,000 square foot warehouse and office space that continues to be CB Distributors's base of operations. Carlos testified that in 2002, on the advice of his estate planning attorney, all shares of the business were transferred into Carlos's name and all parcels of real estate were transferred into Vickie's name.

¶ 8 In 2002 Carlos and Vickie purchased a home in Delray Beach, Florida, in part to accommodate the symptomology associated with Vickie's seasonal affective disorder (SAD) and to avoid her depressive symptoms caused by the long Midwestern winters. Over the next two years, Vickie oversaw the day-to-day aspects of extensive renovations to the Delray Beach home. By 2004 she was residing primarily in Florida.

¶ 9 Vickie testified that she has suffered from anxiety and depression since the 1970s or early 1980s. She revealed that her current diagnoses include anxiety, depression, SAD, and post-traumatic stress disorder (PTSD), which she attributed to "rages" by Carlos during the marriage. Vickie testified that she had been hospitalized twice due to anxiety. In October 1997, while working at the warehouse, Vickie either attempted suicide or accidentally overdosed on Xanax.

Following that incident, she never again worked in a fixed position at CB Distributors. Vickie testified that she had not been employed since the divorce. She said that she generally avoided stressful environments that would trigger her depression and PTSD, and that she did not think that many workplaces would accommodate her specific needs. Vickie testified that she filled her time in part with charity work and that she had spent significant time caring for several sick relatives.

¶ 10     In November 2006, Carlos filed the petition for dissolution of marriage. On December 22, 2006, the trial court entered a judgment dissolving the marriage but reserving disposition of "all financial matters." Beginning in January 2007, by agreement, Carlos paid Vickie $9000 per month in temporary maintenance, which was increased by agreement to $10,000 per month in June 2010. Early attempts at a settlement failed, and for various reasons, the case languished over the next 12 years. As of November 2018, Carlos had paid $1.33 million in temporary maintenance to Vickie.

¶ 11     On August 13 and 15, 2018, the court held an evidentiary hearing on the remaining financial matters. At the time of the hearing, Carlos was 69 years old and Vickie was 61 years old. On November 6, 2018, without entering an order, the trial court filed a memorandum of decision that detailed the court's findings based on the testimony and exhibits from the hearing. The memorandum stated in part that the court intended to award Carlos 60% ($6.29 million) and Vickie 40% ($4.19 million) of the total stipulated marital estate ($10.48 million). It further stated that it would reduce the monthly maintenance payment from $10,000 to $6000 but, as an alternative to the risks associated with periodic maintenance, it would order that Carlos pay maintenance in gross to Vickie in the amount of $720,000.

¶ 12    On November 20, 2018, the court held a status hearing on its pending order relating to the remaining financial matters. The attorneys for the parties indicated that they had been working together to draft a proposed order based on the court's findings in the memorandum of decision. Vickie's attorney reported that they had not yet reached an agreement on the language and asked the court to set the case for entry of the order on December 11, 2018, "even if it's not an agreed order."

¶ 13    Carlos's attorney indicated that the maintenance in gross decision was the sticking point between the parties. He expressed concern over potential tax implications of maintenance in gross compared to periodic maintenance. The court acknowledged the concern, but explained that it had its own concerns about Carlos's ability to pay maintenance over an extended period: "I hope Mr. Bengoa lives forever, but at his age I'm not sure he can keep up that pace."

¶ 14    On December 11, 2018, the attorneys indicated that they had still not reached an agreement for the wording on the maintenance in gross issue. Carlos's attorney said that the maintenance in gross determination would likely be the subject of a motion to reconsider because he now believed that the payment would not be tax deductible and that the court should have considered these tax implications before it awarded maintenance in gross. The court responded in part: "If it's deductible, it's deductible, if it's not, it's not. That's—the IRS is going to dictate that." The court entered its order requiring Carlos to pay maintenance in gross of $720,000 by December 28, 2018, and the court incorporated its memorandum of decision into its order.

¶ 15    On December 14, 2018, Carlos filed his motion to reconsider, which stated in general terms that the court had erred in its application of existing law to these facts by awarding maintenance. Alternatively, if the court did not err in awarding maintenance, then it erred by awarding maintenance in gross versus periodic maintenance. Carlos requested a briefing

schedule so that he could more fully set forth his arguments. The court granted Carlos's request and set a briefing schedule; Carlos's brief was due on January 8, 2019, and Vickie's response was due by January 29, 2019.

¶ 16   On January 7, 2019, without explanation, Carlos filed a motion to voluntarily withdraw his motion to reconsider. On January 15, 2019, the trial court granted Carlos's motion to withdraw his motion to reconsider. Carlos timely appealed and Vickie timely cross-appealed.

¶ 17                                II. ANALYSIS

¶ 18   Before addressing the merits of this appeal, we first turn to the matter of jurisdiction. On December 22, 2006, the trial court entered an order dissolving the parties' marriage but reserving all remaining financial issues. On December 11, 2018, the trial court entered a final and appealable order that disposed of all remaining financial issues from the marriage. On December 14, 2018, Carlos filed a motion to reconsider, which he later sought to withdraw. On January 15, 2019, the trial court entered an order granting Carlos's motion to withdraw his motion to reconsider. The January 15 order disposed of the "last pending postjudgment motion directed against th[e] judgment," and the parties had 30 days from that order to file a notice of appeal. Ill. S. Ct. R. 303(a)(1) (eff. July 1, 2017). Carlos timely filed his notice of appeal on February 13, 2019. On February 22, 2019, within 10 days of service of the notice of appeal, Vickie timely filed her notice of cross-appeal under Illinois Supreme Court Rule 303(a)(3) (eff. July 1, 2017). Accordingly, we have jurisdiction over this appeal.

¶ 19                          A.  Maintenance Order

¶ 20   Carlos challenges the trial court's maintenance order, arguing that (1) the court erred in awarding a $720,000 lump-sum maintenance in gross payment because it did not properly balance the factors in section 504 of the Illinois Marriage and Dissolution of Marriage Act (Act)

(750 ILCS 5/504) (West 2018)), and alternatively, if the court did not err in awarding the lump-sum maintenance in gross payment, (2) it erred by failing to consider the tax consequences of its order, and (3) it erred by ordering a lump-sum maintenance in gross payment rather than continuing monthly payments.

¶ 21    Whether maintenance is appropriate, in what amount, and over what period is within the discretion of the trial court, and that decision will not be overturned absent an abuse of discretion. *In re Marriage of Heroy*, 2017 IL 120205, ¶ 24.  An abuse of discretion occurs only where "the trial court's ruling is arbitrary, fanciful, unreasonable, or where no reasonable person would take the view adopted by the trial court." (Internal quotation marks omitted.) *Heroy*, 2017 IL 120205, ¶ 24.

¶ 22                                    1. *504 factors*

¶ 23    Carlos argues that the factors in section 504(a) of the Act (750 ILCS 5/504(a) (West 2016)) do not justify a finding that Vickie was entitled to a "$720,000 lump-sum maintenance in gross payment."  He contends that, considering that he had already paid 12 years of temporary maintenance, it was unreasonable to order him "to pay the functional equivalent of 10 more years of non-deductable maintenance" at the rate of $6000 per month.  Carlos is essentially conflating three arguments under the banner of section 504(a): (1) any maintenance award was inappropriate, (2) the amount awarded was excessive, and (3) the duration of the award was excessive.

¶ 24    Before the trial court sets an amount and duration for maintenance, it must first determine whether maintenance is appropriate. *In re Marriage of Carstens*, 2018 IL App (2d) 170183, ¶ 31.  The factors outlined in section 504(a) assist the trial court in making that determination. *Carstens*, 2018 IL App (2d) 170183, ¶ 31.  Those factors are:

"(1) the income and property of each party ***;

(2) the needs of each party;

(3) the realistic present and future earning capacity of each party;

(4) any impairment of the present and future earning capacity of the party seeking maintenance due to that party devoting time to domestic duties or having forgone or delayed education, training, employment or career opportunities due to the marriage;

(5) any impairment of the realistic present or future learning capacity of the party against whom maintenance is sought;

(6) the time necessary to enable the party seeking maintenance to acquire appropriate education, training, and employment, and whether that party is able to support himself or herself through appropriate employment;

(6.1) the effect of any parental responsibility arrangements and its effects on a party's ability to seek or maintain employment;

(7) the standard of living established during the marriage;

(8) the duration of the marriage;

(9) the age, health, station, occupation, amount and sources of income, vocational skills, employability, estate, liabilities, and the needs of each of the parties;

(10) all sources of public and private income including, without limitation, disability and retirement income;

(11) the tax consequences to each party;

(12) contributions and services by the party seeking maintenance to the education, training, career or career potential, or license of the other spouse;

(13) any valid agreement of the parties; and

(14) any other factor that the court expressly finds to be just and equitable." 750 ILCS 504(a) (West 2016)

¶ 25    Only after the court determines that maintenance is appropriate based on the section 504(a) factors does it turn to section 504(b-1) (750 ILCS 5/504(b-1) (West 2016)) for guidance in setting the amount and duration of the maintenance award.    *Carstens*, 2018 IL App (2d) 170183, ¶ 31.  Thus, we consider Carlos's argument regarding the balancing of the factors in section 504(a) only as to whether the maintenance award was appropriate, not whether the amount or duration of the award was excessive.

¶ 26    The gist of Carlos's argument is that he paid Vickie $1.33 million in maintenance over the previous 12 years and that the court awarded Vickie $4.19 million from the marital estate. Therefore, additional maintenance was not "fair or acceptable."  According to Carlos, an analysis of the factors in section 504(a) supports his conclusion:[1]

- section 504(a)(1)—the court did not correctly consider the investment income that $4.19 million would generate;

- section 504(a)(2)—Vickie demonstrated "little in the way of need" through her testimony or financial affidavit;

- section 504(a)(3)—while Vickie's earning capacity is "admittedly nominal," that is because she failed to complete her education or find employment over the past 12 years;

- section 504(a)(4)—any impairment of Vickie's earning capacity was of her own making because she had the time and the money to complete her education;

---

[1]    Carlos makes no argument as to section 504(a) factors (5), (6.1), (9), (13), or (14).

- section 504(a)(6)—in the 12 years since the dissolution of marriage, Vickie made no effort to acquire education, training, or employment that would aid her in becoming self-supporting;

- section 504(a)(7)—Vickie did not require maintenance to maintain the "conservative" standard of living established during the marriage;

- section 504(a)(8)—the 12-year duration of the marriage did not support an order that effectively awarded Vickie 22 years of maintenance (12 years of temporary maintenance plus 10 years for the maintenance in gross calculation);

- section 504(a)(10)—Vickie has "some, albeit small, streams of income," which the court should have considered;

- section 504(a)(11)—Carlos states that he discusses "this issue" (tax consequences) later in his brief, but he does so only as to the manner, not the appropriateness of a maintenance award to Vickie; thus, he has failed to articulate a cohesive legal argument and he has forfeited the issue of tax consequences as they relate to the appropriateness of the award under section 504(a) (*In re Marriage of James and Wynkoop*, 2018 IL App (2d) 170627, ¶ 37 (failure to articulate a cohesive legal argument results in forfeiture));

- section 504(a)(12)—Vickie made no contributions during the marriage to Carlos's education or vocational training.

¶ 27    Vickie responds that the court properly determined that she had a need for maintenance under section 504(a)(2) of the Act, particularly if she were to sustain her standard of living established during the marriage pursuant to section 504(a)(7). She further argues that the income and property of each party under section 504(a)(1), the earning capacity of each party under

section 504(a)(3), and the age, health, station, occupation, vocational skills, and employability of each party pursuant section 504(a)(9) all weighed in her favor.

¶ 28    In its memorandum of decision, which the court fully incorporated into its final order, the court expressly recognized that it should consider each of the factors in section 504(a) when determining whether a maintenance award was appropriate.  In so doing, the court stated:

"One could certainly make the case that [Vickie] should be able to live out her days in comfort given the total value of the assets she currently possesses ***.  [S]he will also have another $1,930,304.60 in cash and/or equity upon which to survive, in addition to the monies she will eventually receive on a monthly [basis] from her pension and IRAs.  But the court's decision is not that simple.  The court's task is not to decide whether [Vickie] is able to reasonably support herself.  Instead, the court is charged with determining whether she can support herself at the standard of living enjoyed by the parties during the marriage. [Citation].   While issues of property distribution and maintenance are interrelated [Citation], Illinois law does not require the non-working former spouse to sell her assets or substantially impair available capital in order to maintain herself in a manner commensurate with the standard of living established during the marriage, particularly when the working spouse has sufficient income and assets available to meet both parties' reasonable needs moving forward.  [Citation].

***

An award of maintenance in the case at bar really boils down to two factors:  (1) need, § 504(a)(2); and (2) standard of living established during the marriage, § 504(a)(7).  Indeed, [Carlos] admits he has the capacity to pay maintenance and has demonstrated the

ability to pay temporary maintenance at the rate of $10,000 per month for over 12 years now."

¶ 29    The court noted in its memorandum of decision that it must first consider the factors in section 504(a) and then make a finding as to whether a maintenance award was appropriate. It discussed the facts related to the 504(a) factors, and it identified the two factors it found most important: (1) Vickie's need for maintenance and (2) her lifestyle established during the marriage. The court thoroughly explained its reasoning over several single-spaced pages, finding that Vickie had demonstrated a need for maintenance. The court noted that the marriage began with Vickie working as an hourly employee and living in a modest Roscoe home and that it ended with Vickie removed from the workforce, living in a high-value Florida home, and wanting for nothing. Whether the circumstances surrounding Vickie's unemployment were due to her physical and mental health concerns, or whether she self-opted out of the workforce due to her newfound affluence, the evidence indicated that she lacked the necessary tools as of the dissolution of the marriage to generate the monthly income necessary to maintain her lifestyle. "Arguably," wrote the court, "[Vickie] is best suited and trained for hourly labor and nothing more, even if one assumes she is not disabled."

¶ 30    The court rejected Vickie's argument that it should consider her needs in 2018 and instead focused on whether maintenance was required to maintain the lifestyle established during the marriage. It rejected several line items in her financial affidavit and determined that they either misrepresented her needs or no longer represented her actual expenses. The court further considered the effects that her (1) cash on hand, (2) current streams of investment income, (3) future streams of income (Social Security, pension benefits, and IRA distributions), and (4) portion of the marital estate would have on her ability to maintain the lifestyle established during

the marriage. The court recognized that Vickie currently owned two homes in Florida and one in Rockford that were free and clear of any mortgages or encumbrances. Only after conducting this detailed analysis, and only after considering Carlos's capacity to pay, did the court use its discretion to reduce Vickie's monthly maintenance award from $10,000 to $6000. It effectively awarded her monthly maintenance of $6000 for 10 years. As an apparent counterbalance to reducing Vickie's monthly maintenance award, the court further exercised its discretion by eliminating the risk that she might not receive all of the future payments, ordering Carlos to pay the award in a lump-sum maintenance in gross payment of $720,000.

¶ 31    The record is clear that the court considered the factors in section 504(a), including: (1) each parties' income and property; (2) Vickie's need for maintenance; (3) both parties' present and future earning capacities; (4) whether Vickie's earning capacity was impaired; (5) the time necessary for Vickie to acquire education, training, and employment, and whether she could obtain appropriate employment; (6) the standard of living established during the marriage; (7) the duration of the marriage; (8) Vickie's age, health, station, occupation, vocational skills, employability, and liabilities; and (9) Vickie's retirement income. While Carlos may not agree with the court's conclusions, the court appropriately considered the relevant factors and placed the most significant weight on the needs of each party and the standard of living established during the marriage. *In re Marriage of Reynard*, 344 Ill. App. 3d 785, 790 (2003) (the court is not required to give equal weight to the section 504(a) factors and may award maintenance as it deems just). After carefully considering the testimony, exhibits, and arguments, the court found that maintenance was appropriate and that Carlos had the capacity to pay. We cannot say that the court abused its discretion by awarding maintenance based on its consideration of the factors in section 504(a).

¶ 32                           2. *Tax consequences*

¶ 33     Carlos next argues that the court abused its discretion by awarding maintenance in gross because it failed to consider the tax consequences of maintenance in gross compared to periodic maintenance.    He claims that maintenance in gross is not tax deductible, whereas periodic maintenance is deductible, and that the court should have considered this secondary effect when deciding how to structure the award.  Carlos, however, has waived this issue by failing to raise it before the trial court.  The general rule in Illinois is that allegations of error not raised in the trial court are waived, and cannot be raised for the first time on appeal.  *Lemke v. Kenilworth Insurance Co.*, 109 Ill. 2d 350, 354-55 (1985).

¶ 34     Carlos argues that he is justified in raising this issue for the first time on appeal because the court created this issue by the entry of its judgment when it ordered that Carlos pay maintenance in gross rather than periodic maintenance.  Therefore, according to Carlos, this was never an issue at the hearing, and he had no reason to raise it.

¶ 35     We reject Carlos's assertion that this issue "only reared its head as a direct result of the court's order."   In his written closing argument, Carlos framed the maintenance issue for the court by asserting that it could "terminate, modify, or extend maintenance."  He argued that the court should terminate maintenance or, alternatively, substantially reduce maintenance and set a termination date.  Vickie, on the other hand, argued that maintenance should be increased to $15,000 per month for life.  The court granted Carlos's alternative argument by substantially reducing the amount from $10,000 to $6000 per month and setting a termination date of 10 years hence.  Then, based on the court's concerns about Carlos's continued ability to earn income at his historical levels, the court ordered Carlos to pay the entire amount upfront as lump-sum maintenance in gross.

¶ 36    In Illinois there are four common types of maintenance in a final judgment:    (1) permanent maintenance with an indefinite duration; (2) rehabilitative maintenance for a fixed term; (3) rehabilitative maintenance subject to a set review date; and (4) maintenance in gross, which is a specific, nonmodifiable sum.  *Shen v. Shen*, 2015 IL App (1st) 130733, ¶ 84.  Carlos failed to raise any question relating to the impropriety of maintenance in gross, though it was foreseeable that, should he prevail in his request for a reduction in maintenance, the court would structure the award under one of these four types, including maintenance in gross.  He presented no argument, tax consequences or otherwise, regarding the ancillary effects of granting his request using any particular type of maintenance.  The court granted Carlos's request to reduce maintenance and to terminate it at a known date in the future.  Carlos cannot now claim that "tax consequences" was never an issue simply because he failed to present evidence or a specific argument that the court should grant periodic maintenance instead of maintenance in gross.

¶ 37    Even if we were to accept Carlos's contention that he was blindsided by the court's order, he had the opportunity to right this alleged wrong in a motion to reconsider.  Carlos became aware of the court's decision to classify the award as maintenance in gross when the court filed its memorandum of decision on November 6.  After the court entered its order on December 11, Carlos filed his motion to reconsider.  Over Vickie's objection, he was given until January 8 to file a brief in which he could further develop his argument about why the court erred when it ordered maintenance in gross.  Without explanation and without filing his brief, Carlos chose to withdraw his motion to reconsider.  At oral argument, Carlos asserted that he was not required to file a motion to reconsider, and that he could have taken the matter straight to appeal.  He argued that he did raise the tax consequences issue before the trial court by presenting the motion to reconsider and that his withdrawal of the motion to reconsider was only a relinquishment of the

trial court's ability to decide the issue, not a waiver of the substantive issue. Carlos's argument misses the mark. His voluntary withdrawal of his motion to reconsider deprived Vickie of the opportunity to respond with her own evidence or argument concerning the tax consequences of the maintenance in gross award, and it additionally deprived the trial court of the opportunity to correct the alleged error. See *Romito v. City of Chicago*, 2019 IL App (1st) 181152, ¶ 33 (purpose of the rule against raising an issue for the first time on appeal is to allow the trial court to correct any errors, and failure to raise an issue or theory prejudices the opposing party by depriving that party to respond with its own evidence and argument). Accordingly, Carlos has waived his right to raise this issue on appeal. See *Center Partners, Ltd. v. Growth Head GP, LLC*, 2012 IL 113107, ¶ 66 ("Waiver" is the voluntary relinquishment of a known right that arises from an affirmative, consensual act surrendering that right).

¶ 38                                3. *Maintenance in gross*

¶ 39    Carlos's final argument is that the trial court abused its discretion by awarding maintenance in gross rather than periodic maintenance because it had no "real basis to do so," notwithstanding the court's stated concerns that Carlos's age left it wondering if he could continue to earn income at his current level. Carlos again claims, without citing authority, that there are significant tax ramifications for both parties when the court orders maintenance in gross rather than periodic maintenance. This is essentially the same claim Carlos made regarding the tax consequences of the court's order, couched in a different legal argument. As discussed above, Carlos did not advocate for any particular type of maintenance at the hearing. When he had the opportunity to argue error in a motion to reconsider, he chose not to do so. Consequently, Carlos is raising this issue for the first time on appeal and has forfeited the argument. *Romito*, 2019 IL App (1st) 181152, ¶ 33.

¶ 40                                    B.  Division of Marital Property

¶ 41    In her cross-appeal, Vickie contends that the court's division of marital property was inequitable.  Vickie notes that the trial court awarded 40% of the marital estate to her and that it awarded 60% of the marital estate to Carlos.  She asserts that this allocation constituted an abuse of discretion because the trial court's findings regarding the relevant factors set forth in section 503(d) of the Act (750 ILCS 5/503(d) (West 2016) were against the manifest weight of the evidence.  Section 503(d) aids the court by requiring that it divide the marital estate in "just proportions," when considering all of the relevant factors set forth therein.  In this case, Vickie argued that the court's findings on the following factors were against the manifest weight of the evidence:[2]

> "(1) each party's contribution to the acquisition, preservation, or increase or decrease in value of the marital or non-marital property ***;
>
> ***
>
> (3) the value of the property assigned to each spouse;
>
> (5) the relevant economic circumstances of each spouse when the division of property is to become effective ***;
>
> ***
>
> (8) the age, health, station, occupation, amount and sources of income, vocational skills, employability, estate, liabilities, and needs of each of the parties;
>
> ***

---

[2]    Vickie makes no argument whatsoever as to section 503(d) factors (2), (6), (7), (9) or (11); she raises factor (4), duration of marriage, but makes no argument, stating only that it does not weigh significantly in favor of either party.

(10) whether the apportionment is in lieu of or in addition to maintenance \*\*\*."

"The touchstone of a proper apportionment is whether it is equitable, and each case rests on its own facts." *In re Marriage of Romano*, 2012 IL App (2d) 091339, ¶ 121. Equitable does not necessarily mean equal, and one spouse may be awarded a larger share of the marital estate if the relevant factors warrant such a result. *Romano*, 2012 IL App (2d) 091339, ¶ 121.

¶ 42 Vickie's argument presents a two-step review process, whereby we first review the factual basis for the court's section 503(d) findings and then review the court's disposition of the marital estate based on those findings. We apply the manifest-weight-of-the-evidence standard to the court's factual findings for each section 503(d) factor upon which the court based its decision, and we apply an abuse of discretion standard for the court's ultimate property disposition. *Romano*, 2012 IL App (2d) 091339, ¶ 121. A decision is against the manifest weight of the evidence when the opposite conclusion is clearly evident or when the court's findings are unreasonable, arbitrary, and not based on the evidence. *In re Marriage of Benink*, 2018 IL App (2d) 170175, ¶ 43. An abuse of discretion occurs only where "the trial court's ruling is arbitrary, fanciful, unreasonable, or where no reasonable person would take the view adopted by the trial court." (Internal quotation marks omitted.) *Heroy*, 2017 IL 120205, ¶ 24.

¶ 43                    1. *Sections 503(d)(3) and 503(d)(5)*

¶ 44 Vickie first focuses on the "vast disparity in assets and income" between the parties. She asserts that the sum of Carlos's pre-judgment assets was $20 million while hers was only $2.14 million, and that Carlos's income was $98,494 per month and her income was only $11,292 per month. Vickie maintains that these disparities weighed in her favor and supported a distribution that awarded her a larger percentage of the marital estate under sections 503(d)(3) and 503(d)(5).

¶ 45    The trial court made findings regarding the assets and income of each party in its memorandum of decision. As to Vickie's assets, her valuation of approximately $2.14 million includes the value of the Rockford home ($329,610), her personal vehicles ($78,000), and the cash value of her life insurance policies ($6101.55). The court recognized that Vickie had vehicles and life insurance policies, but did not make specific findings of fact regarding their value. The testimony of both parties and the exhibits indicated that Carlos resided in the Roscoe home continuously since the dissolution of the marriage in 2006, and the court assigned the value of the Roscoe home to Carlos's assets. This was reasonable under the circumstances, particularly in light of the fact that Vickie had previously been granted sole and exclusive ownership of the Delray Beach, Florida, property, which was valued at $1.54 million. Thus, the bulk of Vickie's pre-judgment personal assets were her cash, mutual funds, retirement accounts, and her three homes. The court valued these items at approximately $1.73 million compared to Vickie's valuation of those assets at $1.72 million. With respect to Vickie's monthly income, the court found that it was approximately $11,000, which is essentially the same as her claim of $11,292. The court's findings relevant to Vickie's assets and income in sections 503(d)(3) and 503(d)(5) were not against the manifest weight of the evidence.

¶ 46    With regard to Carlos's assets and income, the court based its findings on Carlos's testimony and the financial exhibits. It found that Carlos's pre-judgment assets totaled "almost $20 million." Carlos testified that his assets were "pushing close" to $20 million, and Vickie asserts in her brief that his pre-judgment assets were "$20,000,000." Based on the unequivocal evidence in the record, we cannot say that the court's valuation of Carlos's assets was against the manifest weight of the evidence.

¶ 47   Concerning Carlos's income, Vickie argues that it was at least $98,494 per month. The court found it to be $47,435, which is the same amount that Carlos averred to in his financial affidavit.   Vickie's claim that Carlos earns at least $98,494 per month is based on various bank deposits that Carlos made from 2015 to 2018.   Vickie relies on those deposits, which exceeded his stated income, to argue that Carlos's actual income is higher than he claimed in his affidavit. Vickie presented no evidence that Carlos concealed income.  Vickie's attorney cross-examined Carlos about these deposits.   Carlos confirmed each of the deposits but explained that he had received large tax refunds during those periods due to business losses.   Carlos testified that he had not yet filed his 2017 or 2018 personal tax returns as of the time of the hearing.  He did, however, disclose numerous financial documents, including current pay stubs, personal and business tax returns from 2004 to 2016, W-2s, 1099s, and the last three years of bank statements. On redirect examination, Carlos testified that he used his best good-faith estimates to account for his current tax liabilities, and, in turn, his current income.   His attorney asked him directly: "Now, I'm going to ask you a point[ed] question, okay, so listen closely.  Are you, are you trying to hide any money or any assets at all when it comes to any of this stuff?"   Carlos answered: "Not at all."  The court was in a position to observe Carlos's testimony and assess his credibility. It apparently found Carlos's testimony credible.  Based on the evidence in this record, we cannot say that the court's finding that Carlos earned $47,435 per month was against the manifest weight of the evidence.

¶ 48                                     2. *Section 503(d)(8)*

¶ 49   Vickie next argues that her history of mental health issues—depression, anxiety, PTSD, SAD—weighs heavily in support of a property distribution in her favor pursuant to section 503(d)(8) of the Act.   In its memorandum of decision, the court acknowledged Vickie's

testimony where she stated that she had suffered from depression and anxiety since before the marriage. It also noted that Vickie was diagnosed with SAD during the marriage and that she testified that she still suffered from PTSD, which she attributed to abusive and belittling behavior by Carlos. The court found:

"Other than her testimony, however, the court received no evidence concerning [Vickie's] current state of well-being. While [Vickie] claims the cumulative effects of her mental health disorders (anxiety, depression, PTSD and SAD) render her unable to work, no doctor or mental health provider has ever declared [Vickie] disabled. The court received no other evidence substantiating her claimed inability to work."

The court further found:

"Given the limitations she attributes to her mental health issues, [Vickie] asserts she is incapable of any employment. Mental health issues aside, [Vickie] does not have the capacity or time to retool in a manner that would allow her to generate the type of income necessary to sustain the standard of living the parties established during the marriage. It is further unlikely that [Vickie] will acquire additional capital and assets beyond those she currently possesses and those allocated to her as part of this decision. [Carlos's] situation is entirely different. Since 2006 he has continued to operate and grow CB Distributors and CB Distributors has, in turn, generated immense additional personal wealth for him. By his own estimate, [Carlos] has amassed another $10 million in personal wealth since December 2006. That said, [Carlos] is now 69 years old and the company's performance has waned over the past three calendar years. It is fair to question, if not doubt, that [Carlos] can continued [*sic*] at the rate he has operated over the course of the past 12 years."

The court's findings accurately reflect the evidence that the parties presented. We cannot say that the trial court's findings regarding the "age, health, station, occupation, amount and sources of income, vocational skills, employability, estate, liabilities, and needs of each of the parties" were against the manifest weight of the evidence.

¶ 50                                    3. *Section 503(d)(10)*

¶ 51      Vickie contends that even with the maintenance in gross award of $720,000, there is still a "huge disparity" between the value of her assets as compared to Carlos's assets, and that that supports a greater distribution of the marital estate in her favor pursuant to section 503(d)(10) of the Act. To the extent that Vickie is arguing that the court failed to recognize the difference in the parties' assets, the record indicates otherwise. As noted above, the court found that Carlos's pre-judgment assets were "almost $20 million." As to Vickie's assets, the court stated that she currently had access to almost $800,000 in checking, savings, and mutual funds, $190,000 in retirement funds, $740,000 in real property, and that she would be receiving an additional $1.9 million as part of the marital property allocation. The court was aware of the disparity in assets between the parties when it awarded Vickie $720,000 in maintenance in gross, and its findings of fact relating to section 503(d)(10) were not against the manifest weight of the evidence.

¶ 52                                    4. *Section 503(d)(1)*

¶ 53      Lastly, Vickie argues that the court's findings regarding her contributions to the allocation of assets pursuant to section 503(d)(1) of the Act were against the manifest weight of the evidence. She asserts that it was her idea to purchase the franchise, and she further asserts that the court "appeared to completely ignore the financial contribution" that she made to starting CB Distributors. Moreover, Vickie argues that the court failed to assign sufficient weight to her contributions to the business—oversight of insurance matters, landscaping, overseeing company

events, overseeing remodel and expansion of corporate facilities, supervising employees, running errands, signing checks, and making deposits. Additionally, Vickie claims that the trial court "ignored for the most part" her contribution as a homemaker and earner during the early years of the business. Finally, Vickie contends that the court did not give sufficient weight to her two years of renovations at the Florida residence, which allowed Carlos to focus on the business.

¶ 54 The record does not support Vickie's claims that the court failed to consider or properly balance these factors. In its memorandum of decision, the court entered specific findings concerning each party's contributions, citing section 503(d)(1):

"The evidence indicates the parties started the company together in 1994 [Citation]. From the beginning, however, it was [Carlos] out on the road soliciting sales and delivering product. It was [Carlos] that identified and cultivated new customers and product lines. When the business outdrew [*sic*] the parties' home, it was [Carlos] that insisted on transitioning to rented warehouse space. And, it was [Carlos] that ultimately foresaw the need for and benefit of owning necessary warehouse and office space. That's not to say [Vickie] was a complete non-factor. The court believes [Vickie's] claim that she discovered the Mr. Check-Out opportunity in the local paper. [Vickie] clearly participated in financing the start-up of the partnership that eventually became CB Distributors, Inc. In the beginning she helped as-needed, as-requested, and as-available. Though she continued to work for the postal service, from time to time she helped [Carlos] compile product he would need for deliveries scheduled for the following day. She also received, tallied, and deposited receivables. After leaving the postal service in July 1997 (unable to continue working) [Vickie] worked for 3 months in the company warehouse manning phones and prepping orders. Her involvement in the day-to-day

operations of the company unfortunately ended abruptly in October 1997 following a suicide attempt she attributes, in part, to the depressing conditions she experienced inside the warehouse. Thereafter, [Vickie's] role in the company was limited to the tasks [Carlos] assigned (if not allowed) her to perform, including the oversight of insurance matters, landscaping matters, company parties and events, and the remodeling and expansion of corporate facilities. The parties disagree upon the reasons, but the evidence and testimony confirms [*sic*] that [Vickie's] involvement in the company had ended completely by 2004."

The court's findings in its memorandum of decision indicate that it did consider each of the factors that Vickie claims it ignored, and the testimony and documentary evidence in the record support the court's findings. Thus, the findings of fact relating to section 503(d)(1) were not against the manifest weight of the evidence.

¶ 55    5. *Ultimate Decision on the Distribution of the Marital Estate*

¶ 56    Having determined that the court's findings in relation to section 503(d) of the Act were not against the manifest weight of the evidence, we turn now to its decision to award Carlos 60% of the marital estate and Vickie 40% of the marital estate. As stated above, we review the court's division of the marital property for an abuse of discretion. *Heroy*, 2017 IL 120205, ¶ 24.

¶ 57    In its memorandum of decision, the court noted that it was bound to allocate the property in just proportions after considering the factors in section 503(d) of the Act. Citing *In re Marriage of Jones*, 187 Ill. App. 3d 206, 222 (1989), the court recognized that a "just" distribution does not require an "equal distribution, and that what is "just" rests on the unique facts and circumstances of each case. The court then examined the section 503(d) factors in meticulous detail.

¶ 58    The court first found that this marriage of 12 years and 9 months was of relatively short duration.  It further found that the parties presented "virtually no supporting" evidence regarding their assets heading into the marriage, and thus, the entirety of the stipulated $10.48 million marital estate was amassed during the marriage.  It found that Vickie had been out of the workforce since 1997 and that, whether by agreement or by default, Carlos was solely responsible for the parties' support from 1997 through the date of the dissolution and beyond.  It found that both parties did not spend lavishly on vacations, fine dining, or other luxuries, but nevertheless, in the final years of the marriage, neither party wanted for anything.  The court determined that Vickie, due to age, training, and experience was not suited for employment beyond that of an hourly employee.  Carlos, on the other hand, had continued to grow the CB Distributors and amass wealth, though he was then 69 years old and the pace of the business's growth had slowed in recent years.  Regarding each party's contribution to the acquisition, preservation, and increase or decrease in value of the marital estate, the court relied on the findings of fact discussed above, finding:

> "[T]he testimony and evidence overwhelmingly supports [Carlos's] claim that he is primarily, if not solely, responsible for the massive amount of wealth generated during the parties' 12 year [*sic*] marriage.  ***  [Carlos's] contribution to the marital estate was in fact greater and justifies the allocation of a greater portion of the marital estate to him. [Citations]."

The court took into account Vickie's prejudgment assets, which included three homes valued at $733,820 and unencumbered by debt, cash and mutual funds valued at $799,389, retirement assets worth $190,000, and her forthcoming payment of $1.93 million for her portion of the marital estate.  It then considered her testimony where she claimed to be a frugal person who did

not spend money on vacations, fine dining, or fancy clubs and concluded that its allocation of 60% of the marital estate to Carlos and 40% to Vickie would not result in substantial injustice to Vickie. This is particularly true when the lump-sum maintenance in gross amount of $720,000 is also added to the calculus. Based on the unique facts of this case, we cannot say that the court abused its discretion in its order that distributed the assets of the marital estate.

¶ 59                                III. CONCLUSION

¶ 60    For the reasons stated, we affirm the judgment of the circuit court of Winnebago County.

¶ 61    Affirmed.