2020 IL App (2d) 181029-U
No. 2-18-1029
Order filed April 6, 2020

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| *In re* MARRIAGE OF | ) | Appeal from the Circuit Court |
| RAE ANN METZ, | ) | of McHenry County. |
| | ) | |
| Petitioner-Appellant, | ) | |
| | ) | |
| and | ) | No. 16-DV-0126 |
| | ) | |
| CHRIS W. METZ, | ) | Honorable |
| | ) | Michael E. Coppedge, |
| Respondent-Appellee. | ) | Judge, Presiding. |

JUSTICE BRIDGES delivered the judgment of the court.
Justices Schostok and Hudson concurred in the judgment.

**ORDER**

¶ 1    *Held*: (1) The trial court's finding that certain real property owned by respondent was non- marital was not against the manifest weight of evidence, (2) the trial court did not abuse its discretion in determining child support and maintenance, and (3) the trial court did not abuse its discretion in awarding only a portion of the petitioner's requested attorney fees. Therefore, we affirmed.

¶ 2    Petitioner, Rae Ann Metz, appeals from the judgment dissolving her marriage to respondent, Chris Metz. She contends that the circuit court erred in several ways: (1) determining that certain property owned by Chris was non-marital, (2) determining Chris's income for the

purposes of calculating maintenance and child support, and (3) awarding only a portion of Rae Ann's requested attorney fees. For the following reasons, we affirm.

¶ 3                                 I. BACKGROUND

¶ 4      Chris and Rae Ann were married on August 5, 1997, and Rae Ann filed a petition for dissolution of marriage on February 16, 2016. A trial was held over nine days from July 2018 to October 2018. At the time of the trial, Chris was 56 and Rae Ann was 59. The parties had two children aged 14 and 16.

¶ 5      Rae Ann testified to the following. Prior to the marriage, Rae Ann worked as a buyer at Sears with a salary of $62,500. She left Sears at the end of 1996 and went to work at Montgomery Wards about six months later as a junior buyer at a salary of $75,000. She was let go from Montgomery Wards in January 1998. The parties then decided that Rae Ann would stay home with the children.

¶ 6      In 2014, Rae Ann obtained her real estate license and worked as a realtor for Berkshire Hathaway from 2014 to 2015. In December 2015, Rae Ann purchased a Snap Fitness franchise. She closed the franchise in January 2017 because it was not profitable. Rae Ann then restarted her real estate practice, but she spent only a few hours each day working. Rae Ann testified that she was the primary caregiver for the children, and that while Chris has visitation time on the weekends, he rarely exercised it as his relationship with the children was strained. Thus, she bore most of the expenses for the children's care. Her monthly expenses totaled $12,120.26.

¶ 7      Deborah Gordon testified as an expert for Chris in the field of vocational analysis. Gordon testified that she met with Rae Ann and had her complete some vocational testing. She further testified that based on the testing, she believed Rae Ann was best suited to work either in sales or real estate and determined that Rae Ann's earning potential was between $41,000 and $57,000.

¶ 8    Chris testified that he owned 97.5% of Novation Industries, Inc., f/k/a W.M. Plastics, Inc., a custom injection molding company, and was the company's CEO. He testified that he started working for Novation in 1979 and left in 1980. He then resumed working for Novation in 1982 and has worked there ever since. Chris testified that he typically worked 20 to 24 hours a week, Tuesday through Thursday, and his base salary was $186,000 per year. He also testified that because Novation was an S corporation, its income was reported on his tax returns, but that Novation retained its earnings, only issuing dividends sufficient to cover his tax obligations. He testified that Novation also paid for his cell phone; provided him with two company vehicles, a Toyota Highlander and a Toyota Avalon; paid for his gas; paid the insurance on the vehicles; and provided him two company credit cards, which he used for business expenses including travel and entertainment. Peter Martel, Novation's comptroller since 2006, corroborated Chris's testimony regarding his compensation from Novation.

¶ 9    Chris testified that he purchased his first shares of Novation in 1983,[1] when his father died, and that his mother gifted him the remaining shares prior to his marriage to Rae Ann. Based on the stock certificates produced at trial, these gifts appear to have occurred over a period of time spanning from December 1988 to January 1997.

¶ 10    Chris testified that Novation was located at 5151 Bolger Court in McHenry, Illinois. Novation leased the property, which was owned by a land trust. The beneficiary of the land trust was a limited liability company owned by Chris and his mother, (who both owned a 50% interest) registered as 5151 Bolger Court, LLC, hereinafter referred to as Property.

¶ 11    Chris testified that he first acquired the Property in either 2000 or 2001, and that the building was constructed in 2001. He further testified that he did not use any of his own money to

_____

[1] It appears from the stock certificates that this actually occurred in 1982.

purchase the Property, and that the collateral used included his interest in Novation, but not any other personal assets.

¶ 12    Chris's testimony was corroborated by Thomas Moran. Moran testified that he was the senior vice president of commercial lending with MB Financial. Further, he testified that Novation had been a client of his since around 1993 or 1994, and that he underwrote the bonds for the Property in 2001. He testified that the loan was secured by the Property, Chris's stock in Novation, and Novation's assets, and that Chris had not personally guaranteed the loan.

¶ 13    Chris testified that in 2012, he sold 50% of his interest in the Property to his mother in order to repay a home equity loan which was coming due that year. This testimony was corroborated by Carl Yudell, Novation's attorney, who testified that he represented Chris's mother in the 2012 transaction.

¶ 14    With regard to Novation's financial state, Chris testified that the company was not doing well, that it had overdrawn its account, and that it was at its maximum credit limit. He also testified that he would likely have to pledge any insurance policies Novation had as collateral to avoid default.

¶ 15    Moran testified that Novation had five loans with MB Financial: (1) the loan on the building, (2) a $1.5 million line of credit, (3) one  small term loans in the amounts of $44,000,  (4) one small term loan in the amount of $50,000 to $60,000, (5) and a line of credit for machinery and equipment in the amount of $150,000 to $200,000. He further testified that per the terms of those loans, there were certain covenants that Novation had to comply with or risk being declared in default. He testified that Novation was in violation of two covenants, which he described as the debt service covenant and the balance sheet covenant. He testified that the bank had not yet decided what to do regarding Novation's loans but was leaning towards taking additional collateral to

secure the loans, in part due to the fact that Novation had a healthy balance sheet as a result of its retained earnings. Novation had a life insurance policy on Chris's mother in the amount of $1 million, and Moran testified that the bank was considering taking the cash value of the policy as additional collateral for Novation's loans.

¶ 16     Brian Remington testified that he worked as the accounts manager at Novation for the last eight years. He testified that he was responsible for maintaining the company's relationship with its "top house accounts," which comprised 70% to 80% of the company's sales. He further testified that Novation's sales for 2017 were between $18 to $20 million, but that the profits were very low, which he attributed to labor costs. Additionally, he believed that 2018 sales would be around $15 million, which was closer to the company's historical norm.

¶ 17     Scott Baxter testified that he had been with Novation for ten years, initially as chief operating officer, and then as president starting in 2012. He testified that in 2017, the company was "borderline break even." He attributed this to poor margins and low productivity. He also testified that in 2017, the company had almost $19 million in revenue, but that he expected that to drop to around $14 to $15 million in 2018 due to the discontinuation of a major product for one of Novation's largest customers.

¶ 18     Martel testified that Novation currently owed the bank approximately $2 million. He further testified that Novation had not been profitable since 2015 and attributed that to pricing pressures from Novation's largest customer, labor costs, losing a large client, and poor profit margins. He estimated that in 2018, Novation would have approximately $1 million in losses.

¶ 19     After the trial, the parties submitted their written closing arguments, and the trial court issued its memorandum decision on November 28, 2018. Regarding the distribution of the marital estate, the trial court determined that because Chris had obtained all of his shares in Novation prior

to the marriage, his interest in Novation was non-marital property. Further, the trial court determined that because the Property was obtained using financing collateralized by non-marital assets, *i.e.*, Chris's Novation stock and Novation's assets, the Property was non-marital. Additionally, the trial court found that the 2012 sale of 50% of the Property to Chris's mother did not render Chris's remaining interest in the Property marital.

¶ 20    The trial court determined the aggregate value of the marital estate to be $901,952.23. The trial court allocated 65% of the marital estate to Rae Ann, based upon the amount of non-marital assets owned by Chris. Rae Ann's allocation included the marital home ($270,000), her Cornerstone Bank accounts ($20,007), her Merrill Lynch IRA ($10,254.94), and $286,007.01 of Chris's W.M. Plastics 401K.

¶ 21    Regarding maintenance, the trial court imputed to Rae Ann an annual income of $49,000 based on Gordon's testimony regarding Rae Ann's earning potential. With regard to Chris's income, in closing arguments Chris maintained that only his salary should be considered as income, whereas Rae Ann argued his income should include the total income reflected in Chris's tax return without including  deductions  for losses attributable to Rae Ann's business losses, depreciation for Novation, and depreciation  and amortization deductions from  the Property. Rae Ann also argued that because Chris's income fluctuated, the court should take the average of the last four years of income, which amounted to $891,756. The court used Rae Ann's method for calculating Chris's income, but it instead chose to use a two-year average, which amounted to $628,427.

¶ 22    The trial court ordered Chris to pay Rae Ann $7,200 per month in maintenance and $2,368.08 per month in child support. On October 9, 2018, Rae Ann petitioned the trial court for

$57,724.22 in attorney fees and costs. The trial court awarded her $25,000. Petitioner timely appealed.

¶ 23                                    II. ANALYSIS

¶ 24                            A. The Bolger Court Property

¶ 25    We begin by addressing Rae Ann's contention that the trial court erred in classifying the Property as non-marital. Rae Ann argues that the ability to acquire the Property was only partially based on Chris's use of non-marital property as collateral, and that Chris's personal efforts in the management of Novation gave Novation the ability to make the mortgage payments on the Property, thus contributing to the acquisition of the Property and the creation of equity therein. As such, Rae Ann maintains that the trial court's determination that the Property was non-marital was against the manifest weight of the evidence. Alternatively, Rae Ann maintains that the trial court should have determined that Chris's marital efforts contributed to the repayment of the loan on the Property, and therefore the marital estate was entitled to reimbursement pursuant to section 503(a)(6.5) of the Illinois Marriage and Dissolution of Marriage Act (Act) (750 ILCS 5/503(a)(6.5) (West 2018)).

¶ 26    Chris responds that the 2001 purchase of the Property was entirely funded through a loan which was solely collateralized by non-marital assets, namely his shares in Novation. Additionally, he maintains the 2012 refinancing did not alter the non-marital nature of the Property, and that the transaction was properly characterized as a divestment of non-marital property,  since 50% of the Property (which was a non-marital asset) was sold to Chris's mother. Chris further argues that because Novation, Chris's non-marital business, paid rent for the Property, no marital assets were used to repay the loan at issue. Likewise, it was not his personal efforts which resulted in the repayment of the loan but rather those of Novation and, even if his personal efforts were a factor,

he was being reasonably compensated for those efforts through his salary. Lastly, Chris argues that even if marital assets were used to repay the loan on the Property, that it would not alter the classification of the Property, rather the marital estate would merely be entitled to reimbursement pursuant to section 503(a)(6.5) of the Act. *Id.*

¶ 27 "A trial court's classification of property as marital or nonmarital will not be disturbed on appeal unless it is against the manifest weight of the evidence." *In re Marriage of James & Wynkoop*, 2018 IL App (2d) 170627, ¶ 20. "A decision is against the manifest weight of the evidence when an opposite conclusion is apparent or when the court's findings appear to be unreasonable, arbitrary, or not based on evidence." *In re Marriage of Verhines & Hickey*, 2018 IL App (2d) 171034, ¶ 51.

¶ 28 The Act provides that "all property acquired by either spouse after the marriage and before a judgment of dissolution of marriage or declaration of invalidity of marriage is presumed marital property." 750 ILCS 5/503(b)(1) (West 2018). As such, a rebuttable presumption exists that any property acquired during the marriage is marital property. *In re Marriage of Romano*, 2012 IL App (2d) 091339, ¶ 45. "This presumption of marital property can be overcome by clear and convincing evidence that the property was acquired by one of the methods listed in section 5/503(a) of the Act." *Id.* One of the exceptions under section 503(a) of the Act is for "all property acquired by a spouse by the sole use of non-marital property as collateral for a loan that then is used to acquire property during the marriage ***." 750 ILCS 5/503(a)(6.5) (West 2018).

¶ 29 The trial court found that the purchase of the Property in 2001 was collateralized with Chris's Novation stock holdings, as well as the equipment, inventory, and assets of Novation. This is supported by the evidence produced at trial, specifically the testimony of Chris and Moran, as well as the loan and security agreements relating to the purchase and construction of the Property.

Based on Chris's testimony as well as the Novation stock certificates, the trial court determined that the collateral was non-marital, as Chris's Novation stock was obtained prior to the marriage and there was no indication that any of Novation's assets were marital. As such, the trial court found that the Property fell within the exception created by section 503(a)(6.5) of the Act (750 ILCS 5/503(a)(6.5) (West 2018)).

¶ 30    Here, the record supported the trial court's finding that the Property was non-martial, particularly the stock certificates and loan documents produced at trial, which were Chris's non-marital property used as collateral in the purchase of the Property. Accordingly, the trial court's finding that the Property was non-marital was not against the manifest weight of the evidence.

¶ 31    Further, we disagree with Rae Ann's position that Chris's personal efforts towards Novation enabled the purchase of the Property and therefore rendered the Property marital.

> "When a spouse contributes personal effort to non-marital property, it shall be deemed a contribution from the marital estate, which shall receive reimbursement for the efforts if the efforts are significant and result in substantial appreciation to the non-marital property except that if the marital estate reasonably has been compensated for his or her efforts, it shall not be deemed a contribution to the marital estate and there shall be no reimbursement to the marital estate." 750 ILCS 5/503(c)(2)(B) (West 2018).

Where the language of a statute is clear, courts must give effect to its plain and ordinary language. *Whitaker v. Wedbush Securities, Inc.*, 2020 IL 124792, ¶ 16. Under the plain language of section 503(c)(2)(B), when a spouse contributes personal efforts to non-martial property, the marital estate is entitled to reimbursement; however, it does not automatically transmutes the non-marital property into marital property. See 750 ILCS 5/503(c)(1) (West 2018) (describing circumstances in which non-martial property is transmuted into marital property). Additionally, Rae Ann cites no

caselaw in support of her contention that the contribution of martial efforts can transform non-martial property into marital property. As such, even if Chris's personal efforts benefitted either the Property or Novation, it would not alter the non-marital classification of the Property.

¶ 32     As to Rae Ann's alternative argument that the marital estate is entitled to reimbursement for Chris's efforts, we also disagree. The trial court found that there was no evidence to establish that Chris's efforts resulted in "substantial appreciation" of Novation. The court based this finding on the unrebutted testimony of Remington, Baxter, and Martel that Novation had taken a financial downturn. While Rae Ann challenges the credibility of these witnesses on the grounds that they were all employed by Novation and in effect by Chris, the trial court found them to be credible. As the finder of fact, the trial court is given deference as to the determination of a witness's credibility because the trial court is in the best position to observe the conduct and demeanor of the witness. *In re Marriage of Sparks*, 2018 IL App (1st) 180932, ¶ 24.

¶ 33     The trial court also found that the marital estate was reasonably compensated for Chris's efforts through Chris's salary. A salary may constitute reasonable compensation for personal efforts. *In re Marriage of Perlmutter*, 225 Ill. App. 3d 362, 372 (1992); *In re Marriage of Morse*, 143 Ill. App. 3d 849, 855, (1986) ("[I]f respondent's salary is found to be reasonable compensation for his efforts, the non-marital business need not reimburse the marital estate because respondent's salary during the marriage is marital property and, thus, the marital estate has already been compensated."). Chris received a base salary of $186,000, as well as additional income attributable to his ownership interest in Novation. Chris testified that he usually worked only three days a week at Novation. As such, we conclude that the trial court's finding that the marital estate had been reasonably compensated for Chris's efforts was not against the manifest weight of the evidence.

¶ 34          B. Chris's Income for the Purposes of Maintenance and Child Support

¶ 35    We next address Rae Ann's contention that the trial court erred in its determination as to Chris's income, and as a result also erred in its determination of the amount of maintenance and child support. Rae Ann contends that the trial court should have used a four-year average to determine Chris's income rather than a two-year average. Rae Ann also argues that the trial court failed to properly consider that Chris left Novation's profits in the business as a form of savings, and the trial court did not properly account for the income which is likely to be generated from the $1 million life insurance policy Novation has on Chris's mother. Finally, Rae Ann asserts that the trial court abused its discretion in its maintenance award because the award was less than it would have been if Chris made less money, such that the spouses' combined gross income would be less than $500,000 and the statutory maintenance guidelines would be applicable.

¶ 36    Chris responds that there is no ironclad rule regarding the number of years that a trial court must consider in determining average income, and that in light of the recent financial downturn Novation was experiencing, the trial court did not abuse its discretion in deciding to use a two-year average. Regarding the life insurance policy on Chris's mother, Chris maintains that any income arising out of that policy is speculative, and therefore the trial court was correct in not considering it. Chris further notes that under either a two-year or four-year average, this case falls outside the statutory guidelines set forth in the Act, and the trial court considered all of the statutory factors specifically, noting Rae Ann's standard of living during the marriage. See 750 ILCS 5/504(a), (b-1) (West 2018).

¶ 37    In support of her contention that the trial court erred in using a two-year average rather than a four-year average, Rae Ann relies on *In re Marriage of Freesen*, in which the court held "that there is no iron-clad rule requiring a trial court to consider only the last three years of income in arriving at net income for child support purposes. At least the three prior years should be used

to obtain an accurate income picture. Beyond that, however, it must be left to the discretion of the trial court, as facts will vary in each case." *In re Marriage of Freesen*, 275 Ill. App. 3d 97, 103 (1995). While Rae Ann acknowledges that the holding in *Freesen* does not create an ironclad rule requiring that at least three prior years be used to determine an average net income, that it suggests as a precedent that a minimum of three years should be used.

¶ 38    A trial court's net income determination is reviewed for an abuse of discretion. Whereas the determination whether an individual item should be considered income under section 505 of the Act is an issue of statutory construction and is reviewed *de novo*. *In re Marriage of Shores*, 2014 IL App (2d) 130151, ¶ 24.

¶ 39    We disagree with Rae Ann's contention that the trial court's use of a two-year average was an abuse of discretion. Where a respondent's income fluctuates from year to year, it is reasonable for a trial court to take an average of prior years' income to determine respondent's net income. *In re Marriage of Tegeler*, 365 Ill. App. 3d 448, 459 (2006). "While a court should not base net income findings upon the mere possibility of future financial resources, neither should it rely upon outdated information which no longer reflects prospective income." *In re Marriage of Freesen*, 275 Ill. App. 3d 97, 103-04. "[T]he relevant focus under section 505 is the parent's economic situation at the time the child support calculations are made by the court." *In re Marriage of Rogers*, 213 Ill. 2d 129, 138 (2004). Accordingly, while using at least three years in determining average income may be a good general practice, the facts may dictate the use of a shorter time frame.

¶ 40    Here the trial court determined that in light of the unrebutted testimony from Moran, Remington, Baxter, Martel, and Chris regarding the recent financial downturn of Novation, a two-year average was appropriate for determining Chris's gross income. The trial court found that due

to a number of factors, including the loss of a major account in 2016, Novation was undergoing "extreme market duress," and as such, considering Chris's income for the years 2014 and 2015 would only artificially inflate Chris's income.

¶ 41    A trial court abuses its discretion when its decision is arbitrary, fanciful, or unreasonable to the degree that no reasonable person would agree with it. *In re Joseph J.*, 2020 IL App (1st) 190305, ¶ 26. In light of the unrebutted testimony as to Novation's financial status, we cannot say that the trial court abused its discretion in taking an average of the years 2016 and 2017 to determine Chris's net income.

¶ 42    With regard to Novation's retained earnings, we disagree with Rae Ann's assertion that the trial court erred when it failed to take into account Novation's retained earnings as a form of retirement savings for Chris. The trial court did consider Novation's retained earnings and found that they were retained for the purpose of offsetting Novation's operating expenses and financial obligations, rather than as a form of retirement savings. Again, the trial court based its finding on the unrebutted testimony of Moran, Remington, Baxter, Martel, and Chris.

¶ 43    As to the life insurance policy on Chris's mother, we disagree with Rae Ann's assertion that the trial court should have considered the policy as a form of income and/or included a provision as to the division of the policy's proceeds between Rae Ann and Chris. When and whether Chris will receive any benefit under the policy is uncertain. Although Chris's mother is 88, she may well go on to live for a significant amount of time. Likewise, Chris may never see any income from the policy because Novation could keep the proceeds itself, transfer the policy to a creditor, or allow the policy to lapse. As such, any income from the policy is speculative, and speculative sources of income only become income for the purposes of section 505 when actually received, if at all. *In re Marriage of Shores*, 2014 IL App (2d) 130151, ¶ 48. Accordingly, the trial

court did not err when it excluded the life insurance policy on Chris's mother in its calculation of Chris's income.

¶ 44    Regarding Rae Ann's argument as to the guidelines, she asserts that despite the trial court's determination that Chris's gross income was $628,247, the trial court's maintenance award was less than the guidelines would prescribe if Chris were making only $450,000.

¶ 45    Where the gross annual income of the parties is less than $500,000, maintenance is calculated using the guidelines set forth in the Act. 750 ILCS 5/504(b-1)(1)(A-B) (West 2018). However, a trial court may deviate from those guidelines if it finds that such deviation would be appropriate. *Id.* In the event that the court awards maintenance outside of the guidelines, it must consider the factors set forth in subsection 504(a). *Id.* at 504(b-1)(2). The trial court determined Chris's gross income was $628,427. As such, the guidelines do not apply.

¶ 46    Rae Ann sets forth no caselaw or statutes to support her contention that an award of less than the highest amount which could be awarded under the guidelines is an abuse of discretion. The trial court considered all of the factors set forth in section 504(a), placing particular emphasis on Rae Ann's standard of living during the marriage and her future earning potential. "The optimal goal of the maintenance act is for the dependent former spouse to become financially independent. However, under circumstances involving former spouses with grossly disparate earning potentials, this goal is often not achievable in light of the dependent former spouse's entitlement to maintain the standard of living established during the marriage." *In re Marriage of Lenkner*, 241 Ill. App. 3d 15, 25 (1993).

¶ 47    Rae Ann's self-reported monthly living expenses were $12,120.26. The trial court found that these expenses were comparable to the standard of living she enjoyed during the marriage, if not somewhat higher. The trial court imputed to Rae Ann an income of $49,000 from her real

estate practice, based on the testimony of vocational expert Gordon. Accordingly, the trial court awarded Rae Ann maintenance of $7,200 per month, reasoning that her imputed monthly income could bridge the gap between her expenses and the maintenance award. Maintenance is designed to allow the recipient spouse to maintain the same standard of living they enjoyed during the marriage, not to provide the recipient spouse with a windfall. *In re Marriage of Micheli*, 2014 IL App (2d) 121245, ¶¶ 24-25.

¶ 48    Because the trial court's maintenance award was calculated in such a way that Rae Ann could maintain the same standard of living she enjoyed during the marriage, the award of maintenance less than the highest amount available under the guidelines was not an abuse of discretion.

¶ 49                                C. Attorney Fees

¶ 50    Finally, we address Rae Ann's contention that the trial court erred in awarding her only $25,000 of her requested $57,724.22 fees and costs. Rae Ann maintains that she is unable to pay the remaining balance of $32,724.22 without undermining her financial stability.  Whereas, in contrast, Chris has sufficient assets to pay the balance, and that the trial court did not fully consider the parties' relative financial abilities.

¶ 51    Chris responds that he has already contributed over $65,000 in fees and costs for Rae Ann[2], and the trial court did not abuse its discretion in awarding Rae Ann $25,000 for fees and costs in light of the 65% of the marital estate which was awarded to her.

¶ 52    "Under Illinois law, each party pays his or her own attorney fees unless the party seeking fees is unable to pay and the other spouse has the ability to do so." *Berger v. Berger*, 357 Ill. App.

---

[2] $20,000 in interim attorney fees, $20,346.50 in interim costs for the valuation of Novation, and $25,000 of the requested $57,724.22 in fees and costs.

3d 651, 662 (2005) (citing 750 ILCS 5/508 (West 2018)). "[A] trial court's decision to award or deny fees will be reversed only if the trial court abused its discretion." *In re Marriage of Schneider*, 214 Ill. 2d 152, 174 (2005).

¶ 53    In light of the fact that Rae Ann received 65% of the marital estate totaling $568,286.95, $7,200 per month in maintenance, as well as the $20,000 in interim attorney fees and $20,346.50 in interim costs already paid by Chris, the trial court's award of $25,000 in attorney fees, instead of the requested $57,724.22, was not an abuse of discretion.

¶ 54                                    III. CONCLUSION

¶ 55    For the reasons stated, we affirm the judgment of the circuit court of McHenry County.

¶ 56    Affirmed.